V.M. appeals from judgments terminating her parental rights as to three of her minor children, M.M., A.M., and L.M., and granting their permanent custody to the State Department of Human Resources ("DHR"). The children's fathers also were parties in these termination cases. We reverse those portions of the judgments terminating the mother's parental rights, and we remand the cases. The trial court's judgments also terminated the fathers' parental rights, but, because the fathers did not appeal, those portions of the judgments relating to the fathers are not before us.
Four children have been born to the mother. The oldest child, Q.M., is living with her paternal grandparents in another state, and the mother's parental rights as to that child are not at issue in these cases. At the time of trial, M.M. was seven years old, A.M. was four years old, and L.M. was approximately 21 months old.
The evidence reveals that the mother has a history of mental illness, that she has had a problem with alcohol and drug abuse for several years, and that the children have been removed from her custody more than once. DHR began working with the mother in October 1990, after Q.M. and M.M. were placed in foster care for two days. On that occasion, the mother's sister was caring for the children, but she telephoned DHR when she decided that she could not continue to care for them. After Q.M. and M.M. were returned to the mother, DHR offered her counseling services, parenting classes, transportation, mental health counseling, drug treatment services, and day care. A.M. was born in May 1993. DHR was contacted at that time because the mother arrived at the hospital with a high level of alcohol in her system. A social worker with DHR developed a safety plan to allow the baby to go home with the mother.
Shortly after A.M.'s birth, the children were placed in foster care because the mother was reported to have left them with an *Page 917 
"inappropriate caretaker." DHR offered to the mother services similar to those provided in 1990. On this occasion, the mother entered an in-patient facility for treatment of her alcohol abuse, but she was transferred to the psychiatric unit of a hospital because she began experiencing psychotic episodes. She was treated with psychotropic medication and was referred to the Calhoun-Cleburne Mental Health Center for out-patient treatment after her release from the hospital. DHR placed the children with their maternal grandmother during this period. In August 1993, the mother moved with the children to her own apartment. In December 1993, however, the children again were placed in foster care after DHR personnel observed that the mother's substance abuse problems had recurred and that she was not caring adequately for the children. The mother entered the hospital and completed a five-day detoxification program. Nettie Robinson, the mother's social worker at DHR in 1993, testified that she asked the maternal grandmother if the children could be placed with her, but that the grandmother declined on this occasion because she said she had to work from 4:00 P.M. to 1:00 A.M. and she was having problems with hypertension. Robinson testified that although she discussed with the maternal grandmother the possibility of day care, the grandmother still declined to take the children. DHR placed the children with a foster family.
DHR continued to work with the mother during 1994 and 1995. During those years, she did not abstain consistently from alcohol and drugs, nor did she maintain treatment for her mental illness. L.M. was born in November 1995. In July 1996, L.M. joined her sisters in foster care, after the mother was reported to have left her with an elderly person who was not able to care for her. Beginning in July 1996, the record reflects no further drug use by the mother, but she did have a positive test for alcohol use in September 1996. At that point, the mother reentered a treatment program for substance abuse.
The mother returned to the Calhoun-Cleburne Mental Health Center for treatment. Her therapist, Eileen Curtain, testified that the mother's treatment team decided initially to observe the mother's participation in a treatment program without the use of psychotropic medication. Curtain reported that the mother was unable to function effectively in therapy without medication. In December 1996, the mother was referred to a psychiatrist, who placed her on Mellaril. Both Curtain and the mother testified that she has responded well to this medication and that it has proven to be effective for her. In January 1997, the mother began attending twice-weekly sessions in a new group therapy program established for patients who had both psychiatric and substance abuse disorders. According to Curtain, the mother's psychiatric symptoms have abated and she has been able to make progress with her treatment. Since January 1997, she consistently had attended her therapy sessions and had taken her medication, and she continued to do so at the time of trial. Curtain testified that there was no indication that the mother had used alcohol or drugs since she resumed treatment. The mother has submitted to random drug tests at DHR's request and has not tested positive since September 1996.
Through February 7, 1997, individual service plans ("ISPs") and other documents prepared by DHR indicated that its permanent plan for these children was for Q.M. to be placed with relatives and for M.M., A.M., and L.M. to be returned to the mother. The ISP dated July 17, 1996, required the mother to work toward becoming drug- and alcohol-free, to have regular contact with her children, and to work toward becoming able to provide financially and emotionally for her family. The record reflects that the mother complied with all of these requirements, except that she was not able to find a job. Nevertheless, DHR filed petitions for permanent custody of the children on February 27, 1997, and an ISP prepared in March 1997 indicated that DHR's plan for the children had changed to adoption. Penny Hill, the mother's social worker at DHR beginning in 1994, testified as follows regarding that change:
 "Q. Between February the 7th and March the 27th, what occurred to change the mind of the Department of Human *Page 918 
Resources as to the placement of [the mother's] children?
 "A. Judge had ordered us to file for permanent custody of the children.
 "Q. Prior to that order, was it the plan of DHR to terminate [the mother's] parental rights?
 "A. The plan had not been changed on paper but the plan had been discussed with her. One of the reasons it was not changed on paper was because the Department was going to give [the mother], you know, benefit of the doubt that progress would be made to see if change could occur.
". . . .
 "Q. According to this ISP from 1996, [the mother] was to submit to random drug screenings and become involved in a drug rehabilitation program, continue visitation with her children, seek adequate employment, keep DHR contacted of her search for employment, [and attend] counseling and a drug program at the Mental Health Center . . . . The only thing that she has not done then in that plan is what?
"A. Gainful employment."
In May 1997, the trial court conducted a review hearing on these cases. In an order issued on May 27, the court stated that "the most appropriate permanent plan for the children is for [Q.M.] to be placed with her grandparents; and for [M.M., A.M., and L.M.] to have parental rights terminated and be placed for adoption." The hearing on the issue of the termination of parental rights was held in August 1997.
The mother is 29 years old. At the time of trial, she testified that she had been living with her mother since November 1996 and that she planned to continue living with her. The mother expressed love for her children and said she was trying to comply with DHR's requirements so that she could be reunited with them. She testified that DHR had told her that in order for her children to be returned, she had to remain drug and alcohol-free and obtain housing, transportation, and employment. She said she had complied with everything except obtaining employment, but said that she had an interview at a fast-food restaurant that evening and that she expected to become employed there. She also had applied for Social Security disability benefits, but had not received a decision from the Social Security Administration. The mother testified that her present medication helps her and that she has not abused alcohol or drugs since L.M. was removed from her custody. She stated that she attended church on Sundays and Bible study on Wednesdays, and that her mother and her church were supportive of her. A social worker engaged by DHR to assist the mother and the children with the separation process testified that she had been able to make little progress because the mother was still "very invested in having her children returned to her."
The children presently reside in a foster home and are reported to be doing well. The record reflects that the mother has maintained consistent communication with her children during the time they have been in foster care, visiting and telephoning them once a week. She also has eaten lunch with M.M. at school occasionally. Hill and the children's foster mother testified that the children express love for their mother and that they still refer to her as "Momma."
At the time of trial, DHR had begun making plans for the children's permanent placement upon the conclusion of the proceedings. Robinson, who is now an adoption worker with DHR, testified that the children had a good chance of being adopted if the mother's parental rights were terminated. Both Robinson and Hill testified that they were concerned about the mother's ability to maintain her current progress and to care for three children on her own. They testified that the mother seemed to do well as long as she lived in her mother's home, but that she had not been able to cope in the past when she moved into her own apartment. Hill stated that, based upon the mother's past history, she could not say that the mother would be able to maintain the progress she had made in recent months. When asked if anything had occurred recently that would indicate to her that the mother was going to "slip off the wagon or quit taking her medicine," however, Hill said no. She also testified that she had *Page 919 
reservations about the mother's ability to care properly for her children and that she thought termination of the mother's parental rights would be beneficial for the children. Curtain testified that although she did not believe the mother would be a danger to her children, she doubted her ability to be responsible independently for her children. With some sort of support system, Curtain said, it was possible that the mother could care for the children.
Hill testified that no relative resources were available for the long-term placement of the children, including the children's maternal grandmother. Hill testified that the grandmother had asked her about taking the children beginning in 1995, and that she had advised the grandmother that a home study and certain paperwork would be necessary. Hill said, however, that no home study was ever done because the grandmother never called to make an appointment with her to schedule the home study or followed through on initiating the paperwork. Hill said that the grandmother told her in March 1997 that she wanted the children if they could not be returned to the mother, and that she told the grandmother to get an attorney. When asked if DHR now took the position that it would not conduct a home study in order to place the children with their grandmother, Hill stated: "At this point, based on the previous history of [the maternal grandmother] declining on more than one occasion for the placement of the children and the Department's stance of permanent custody of the children with adoption, we would remain with that." Hill also testified that she had concerns about placing the children with the grandmother because of her work schedule and because the placement of another teenage granddaughter with her had not been successful.
The termination of parental rights is a serious matter and is not considered lightly. Although a parent has a prima facie right to the custody of his or her child, this right can be overcome by clear and convincing evidence that the child's best interests would be served by removing the child from the parent's custody. M.H.S. v. State Dep't of Human Resources,636 So.2d 419 (Ala.Civ.App. 1994). A consideration of the best interests of the child is fundamental to every proceeding to terminate parental rights. Id. In determining the child's best interests, the trial court must consider whether a party to a custody proceeding is physically, financially, and mentally able to care for the child. J.L.B. v. State Dep't of HumanResources, 608 So.2d 1367 (Ala.Civ.App. 1992). If clear and convincing evidence demonstrates that the party cannot, or is unwilling to, fulfill these responsibilities, then parental rights may be terminated. § 26-18-7, Ala. Code 1975; J.L. v.State Dep't of Human Resources, 688 So.2d 868
(Ala.Civ.App. 1997).
In cases in which a nonparent has instituted termination proceedings, the trial court's decision is governed by a two-part test. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). The first prong of this test requires the trial court to determine that the child is dependent, based upon clear and convincing evidence. J.L.B., 608 So.2d at 1368. The second prong of the test requires the trial court to consider and reject all alternatives to termination of parental rights in order to conclude that termination is in the best interests of the children. Id.; Beasley, 564 So.2d at 954-55. On appeal, the trial court's judgment in this regard is presumed correct, and it will not be reversed by this court unless it is so unsupported by the evidence that it is plainly and palpably wrong. M.H.S., 636 So.2d at 421.
The trial court made both findings in these cases. It noted that M.M. and A.M. had been declared dependent in June 1993 and that L.M. had been declared dependent in August 1996. It then concluded that no less drastic alternative to termination of parental rights was a viable option for any of the children. In so concluding, the trial court stated:
 "That the Calhoun County Department of Human Resources, hereinafter referred to as the Department, has been involved with all of [the mother's] children practically all of their lives. She has not been successful in completing any of the programs necessary for the return of her children. The alleged fathers have not participated in the care of these children and are *Page 920 
therefore found to have abandoned them and abdicated their parental responsibilities to the State.
 "The Department has taken much longer to reach the decision to initiate this action than this Court deems appropriate and as a result may have jeopardized the chances of adoption for these children. The Court therefore urges the Department to re-evaluate their policy on filing for permanent custody in an effort to place the parents on a time frame in which to accomplish the goals set forth for them. This would eliminate the 'yo-yo' effect in these cases wherein the parents exert some efforts when placed under time restraints but otherwise relax or discontinue their efforts to meet these goals. This 'yo-yo' effect is very apparent in these cases and this was allowed to continue beyond a reasonable time due to the Department's apparent willingness to allow the status quo or from failure to appropriately assess the situation until the Court was forced to intervene.
 "There is absolutely no reason that parents should be rewarded at the expense of their children by allowing them to have access to visit with their children when they want to without taking full responsibility for the care and raising of their children.
 "Their mother did not produce a single person who was willing to take these children while the Department presented evidence of their efforts to recruit family members as an alternative to terminating parental rights and she is unfit to have their care, custody and control.
 "This situation has been allowed to 'rock' on too long and it is now time for these children to have some stability and permanency in their lives."
The trial court then terminated the mother's parental rights, as well as those of the children's fathers, and authorized DHR to proceed with permanent plans for the children.
We are mindful of the legal principles that govern a parental rights termination case and the presumption in favor of the trial court's judgment when it has heard ore tenus evidence. Nevertheless, after reviewing the record, we conclude that the trial court's decision to terminate the parental rights of the mother is not supported by clear and convincing evidence.
The evidence regarding the mother's history of mental illness and substance abuse indicates that these might have been proper cases for termination of the mother's parental rights before mid-1996, but they were not proper at the time DHR filed its petitions for permanent custody of the children or at the time of trial in August 1997. The record reflects that by August 1997, the mother had accomplished all but one goal DHR had established for her and that she was working on that last goal. At that time, the mother had been drug- and alcohol-free for almost one full year, she was taking the medication and attending the therapy sessions prescribed to treat her mental illness, and she had obtained stable housing with her mother. She had not yet found stable employment, but she was interviewing for jobs. Furthermore, throughout the time that the children had been in foster care, the mother had visited them consistently in accordance with the visitation schedule established by DHR. The mother testified that she loves her children and does not want to lose them. Therefore, she said, she has made the effort to conquer the problems in her life that caused DHR to place her children in foster care. This court has held that "evidence of current conditions or conduct relating to a parent's ability or willingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence."Bowman v. State Dep't of Human Resources, 534 So.2d 304, 306
(Ala.Civ.App. 1988) (emphasis added). The trial court's decision to terminate the mother's parental rights was premature in light of the evidence that she had been working diligently for approximately one year before trial in an effort to change her circumstances and in light of the evidence that she had made significant progress at the time of trial; therefore, its judgments were plainly and palpably wrong. SeeL.A.G. v. State Dep't of Human Resources, 681 So.2d 596
(Ala.Civ.App. 1996); K.M. v. Shelby County Dep't of Human Resources,628 So.2d 812 (Ala.Civ.App. 1993). *Page 921 
Furthermore, we are not satisfied that all viable, less drastic alternatives to the termination of the mother's parental rights have been investigated and considered. The record clearly indicated that the maternal grandmother was interested in being considered as a relative resource and that she had expressed that interest to DHR beginning in 1995. Despite that potential resource, however, DHR had not performed a home evaluation or otherwise investigated the grandmother. DHR's dismissal of the grandmother appears to be based, in large part, on her refusal to take the children in late 1993. The DHR representative also testified that the grandmother had shown a lack of initiative in contacting DHR regarding the necessary paperwork, that she would be working during much of the time that the children were home from school, and that a placement of an older grandchild had not been successful. All of DHR's objections to the grandmother as a relative resource were based on past history, however, and there was no evidence that she had been considered in light of her present circumstances, her present willingness to be a resource for the children, and the present improvement in the mother's condition. DHR must present "evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least drastic alternative." Bowman, 534 So.2d at 306 (emphasis added). In light of the evidence that the grandmother's present circumstances had not been investigated, the trial court's decision to terminate the mother's parental rights based upon the lack of viable alternatives was plainly and palpably wrong. See G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App. 1995);T.D.M.V. v. Elmore County Dep't of Human Resources,586 So.2d 931 (Ala.Civ.App. 1991).
This court is concerned that the decision to file the petitions to terminate parental rights in these cases was made by the trial court, not by DHR. We are especially concerned that the trial court's instruction to DHR to file the petitions came at a time when the record demonstrates that the mother was making progress toward meeting the goals DHR had established for her. Pursuant to the terms of a consent judgment in federal litigation, DHR has an affirmative duty to facilitate family reunification whenever that goal is possible. See generallyR.C. v. Nachman, 969 F. Supp. 682 (M.D. Ala. 1997). Rehabilitation of a parent and family reunification take time. Often, despite the best efforts of DHR, rehabilitation and reunification are not successful. In these cases, though, the evidence reflects that at the time the trial court heard the evidence the mother was in the process of rehabilitating herself and the time and effort expended by DHR had resulted in the possibility that this family could be reunited. We recognize that incidents occurred in this family's past that would have been grounds for the termination of parental rights. Nevertheless, in August 1997, the mother was making a diligent effort to adjust her circumstances to meet the needs of the children; therefore, a viable alternative to termination of her parental rights existed. See State Dep't of Human Resources v.L.W., 597 So.2d 703 (Ala.Civ.App. 1992). Furthermore, the grandmother's availability and willingness to help provided another viable alternative to termination of the mother's parental rights that merited investigation and consideration. However well-intentioned the trial court's emphasis on the children's permanent placement may have been, the permanent separation of children from a parent remains a traumatic event that is not necessarily in the children's best interests.
This court fully recognizes the difficulty of cases such as this. Nevertheless, the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in these cases "does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute." East v. Meadows, 529 So.2d 1010, 1012
(Ala.Civ.App. 1988). See also L.A.T. v. State Dep't of HumanResources, 588 So.2d 471 (Ala.Civ.App. 1991).
Those portions of the judgments terminating the mother's parental rights are reversed and the cases are remanded for further proceedings consistent with this opinion. *Page 922 
The foregoing opinion was prepared by SAM A. BEATTY, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of §12-18-10(e), Ala. Code 1975.
REVERSED AND REMANDED.
ROBERTSON, P.J., and YATES, MONROE, and CRAWLEY, JJ., concur.
THOMPSON, J., concurs in the result.