785 So.2d 372 (2000)
M.H.J.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
J.D.J.
v.
State Department of Human Resources.
2990715 and 2990716.
Court of Civil Appeals of Alabama.
September 15, 2000.
Rehearing Applications Denied December 1, 2000.
*373 Richard Collins, Cullman, for appellant M.H.J.
C. Blake West, Cullman, for appellant J.D.J.
J. Coleman Campbell and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
CRAWLEY, Judge.
In August 1998, W.J. (the "baby") was born to M.H.J. (the "mother") and J.D.J. (the "father") at Walker Baptist Medical Center. At birth, the baby tested positive for marijuana, as did his mother. Because of the risk of death from respiratory failure faced by the baby, the mother was given an apnea monitor that the baby was to wear to alert her if the child stopped breathing. The mother informed the hospital staff that she intended to nurse the baby. The mother and baby were released from the hospital within 24 hours of the birth, despite the fact that the hospital staff and the Walker County Department of Human Resources ("DHR") knew of the mother's marijuana use and of the mother's plans to nurse the child. The Walker County DHR did notify the Cullman County DHR that the mother and child had tested positive for marijuana, because the mother and father resided in Cullman County and the family was presumed to be *374 heading there. The case was assigned to Dana Rooks.
Rooks tried to locate the family at a relative's home in Cullman County. However, she was told that the family, including the parents' other two children, H.J. (approximate age four) and P.J. (approximate age six), had headed to Arkansas to visit with the father's mother, L.H. (the "grandmother"). Alarmed about the baby's health and the mother's possible continued drug use while nursing the baby, Rooks contacted the grandmother. According to Rooks, she impressed upon the grandmother the importance of locating the family so that DHR could provide assistance. Rooks also said she discussed with the grandmother the need for the baby to be on the apnea monitor and that the mother and baby had tested positive for marijuana. Rooks testified that she asked the grandmother to telephone her, the local child-welfare office, or the local police department if the family arrived at her home. Rooks said that she understood the grandmother to agree to make a telephone call if the family arrived.
The grandmother, however, did not remember that Rooks asked her to call when the family arrived. She testified that she thought that she was to call if the children appeared unhealthy. She said that she spoke with the mother and the father about calling DHR, and that when she did they became agitated and said that DHR wanted to take the baby away from them. They refused to call Rooks and left the grandmother's home. At this point, the grandmother called Rooks and reported that the family had been there, but had left, and that the children all appeared healthy to her.
DHR finally located the family in Cullman County in November 1998. DHR placed the children in foster care. The children were malnourished, and the older children required extensive dental treatment because their teeth were decaying and their gums were infected. The father had placed baby food mixed with formula in the baby's bottle; the baby was only two and one-half months old. DHR filed petitions to terminate parental rights on January 7, 2000; the trial court terminated the parental rights of both parents on March 22, 2000. Both parents appeal, arguing that DHR failed to consider the grandmother as a viable relative resource as an alternative to termination.
"The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interest.... In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala.Code 1975,] § 26-18-7(a)...."
Bowman v. State Dep't of Human Resources, 534 So.2d 304, 305 (Ala.Civ.App. 1988) (citations omitted). The trial court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't of Human *375 Resources, 669 So.2d 187 (Ala.Civ.App. 1995).
To terminate parental rights, the trial court must first determine from clear and convincing evidence that the child is dependent. S.F. v. Department of Human Resources, 680 So.2d 346 (Ala.Civ.App. 1996). The trial court must then determine that there exists no alternative to termination. L.A.G. v. State Dep't of Human Resources, 681 So.2d 596 (Ala.Civ. App.1996). If both requirements are met, the trial court may terminate the rights of the parent.
The parents concede that the children are dependent children. In fact, the parents were both convicted of child abuse and neglect; the record discloses that the father was given three eight-year sentences. They argue only that the grandmother should have been investigated as an alternative to termination, citing V.M. v. State Dep't of Human Resources, 710 So.2d 915 (Ala.Civ.App.1998).
Dana Rooks and Melba Rooks, another DHR caseworker, explained that they did not consider the grandmother a viable alternative to termination because of her lack of cooperation with DHR when she was first contacted about the baby in early September 1998. As Dana Rooks recalled, the grandmother had indicated to her in early September that the children appeared healthy, although they all required extensive medical treatment when finally located by DHR in November 1998. Thus, Dana Rooks testified that she had concluded that the grandmother did not have adequate parenting skills to effectively care for these children. In addition, Melba Rooks testified she had concerns that the grandmother's age, disability, and income would adversely affect her ability to care for three young children. Finally, Dana Rooks testified that she was concerned that the grandmother might relinquish custody of the children to the father once he was released from prison.
The grandmother said she thought she could rear her grandchildren. She explained that she was already rearing a 16-year-old grandson (the father's child from a previous relationship). When questioned about whether her three-bedroom trailer would be adequate to house three more children, she explained that the baby could sleep in her room with her and her husband, the four-year-old girl could have her own room, and the six-year-old boy could sleep in a room with his 16-year-old half-brother.
She testified that she received some $521 in disability benefits a month; however, she said that she did not know her husband's income from a flea market that he ran, but stated that the business was down from previous years. She admitted that she would need monetary assistance to care for three more children.
She also testified that she was receiving disability benefits because she had emphysema, but she admitted that both she and her husband continued to smoke. When asked about her husband's health, she said that he did not go to the doctor, that he appeared healthy to her, but that he did cough frequently. The grandmother admitted that she thought the children were healthy and "fine" when she saw them in September and that she did not think the mother and the father had failed to properly feed the children, although DHR found them malnourished in November.
Although the grandmother obviously expressed a desire to care for her grandchildren, as did the grandmother in V.M., 710 So.2d at 919, 921, we cannot agree with the parents that she was a possible viable alternative to termination in this case, as the grandmother in V.M. was. In V.M., this court reversed a termination of a mother's parental rights partly because DHR had failed to investigate the maternal grand-mother *376 as a viable alternative to termination. Id. at 921. DHR indicated that it had not considered the grandmother as an alternative because she had declined to take custody of the children in 1993, because she had not filled out appropriate paperwork in 1995 when she expressed an interest in the children, because she had not sought out the aid of an attorney although advised to do so in 1997, and because placement of another child with the grandmother had failed in the past. Id. at 919. We held that such past events were not a sufficient basis upon which to determine that the grandmother was not a viable alternative when the termination hearing was held in August 1997. Id. at 921.
In contrast, the grandmother in the present case testified at trial and provided sufficient information to aid the court in determining whether she was indeed a viable alternative to termination. Although, considered alone, the grandmother's failure to contact DHR when the mother and the father arrived at her home may not have been sufficient to rule out the grandmother as an alternative, the court was entitled to consider that failure in light of other factorsher inability to recognize severe health problems in the older children that must have existed in September, her minimal income, the crowded living conditions that would exist if custody of the children were awarded to her, and her own health problems. Given all these factors, we conclude that the trial court's determination that the grandmother is not a viable alternative to termination is supported by the evidence presented.
AFFIRMED.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.