788 So.2d 166 (1999)
M.C.
v.
K.M. and J.M.
R.M.
v.
K.M. and J.M.
2981062 and 2981063.
Court of Civil Appeals of Alabama.
December 10, 1999.
Rehearing Denied February 4, 2000.
Certiorari Quashed December 29, 2000.
*168 George A. Nassaney, Jr., Tuscaloosa, for appellant M.C.
Katie Seals Ferguson, Tuscaloosa, for appellant R.M.
Cheryl Blume Stahl of Stahl & Stahl, P.C., Tuscaloosa, for appellees.
Alabama Supreme Court 1990946.
THOMPSON, Judge.
M.C. (the "mother") and R.M. (the "father")[1] appeal the termination of their parental rights as to their daughter, H.M. (the "child").
The record indicates that the mother was married to another man when the mother and the father began their relationship. The mother later divorced her husband; her ex-husband has custody of the minor son from that marriage.
The mother and father never married. The father had only intermittent contact with the mother during her pregnancy. It is undisputed that the mother used illegal drugs, including crack cocaine, during her pregnancy. Although the father denied the mother used cocaine in his presence during the pregnancy, the mother testified that she did use crack cocaine with the father immediately after being released from the hospital following an episode of "false labor."
The child was born in March 1996. When the child was born, she tested positive for cocaine. The Department of Human Resources ("DHR") immediately began attempting to assist the mother in obtaining treatment for her drug problem.
The parties' testimony regarding the time that they lived together was vague. It appears that the mother, father, and child lived together for a few months at some point after the child was born. The mother and child also lived with the mother's grandmother. It is undisputed that the mother used illegal drugs during the first year of the child's life. However, the testimony of the witnesses at trial established that the mother took adequate care of the child during that time.
LaWanna Kennedy, a DHR social worker, testified that in 1996 she attempted to place the mother in a drug-rehabilitation facility. The mother left that facility within two weeks, without completing the program. The father picked the mother up from the rehabilitation facility and took her and the child to Chicago, where he was living at the time. The mother eventually returned to Alabama. Kennedy testified that although she knew the father to be the putative father of the child, she never had an address for him and that he contacted her only one time.
In February 1997, the mother was arrested for violating her parole. The mother *169 had been on parole for theft. Her parole was revoked after the results of a drug-screening test revealed that she was using illegal drugs. At the time of her incarceration, the mother left the child in the care of the mother's grandmother. After a few days, the child's great-grand-mother called DHR and informed a social worker that she was not physically capable of taking care of the then 11-month-old infant. The child was taken into protective custody at that time.
When the child was placed into protective custody in February 1997, no relatives were willing or able to take the child into their homes. In February 1997, the father contacted Kennedy to ask for custody of the child. Kennedy told the father that he had to establish his paternity of the child in order to receive visitation rights, to be considered as an alternative for placement of the child, or to receive custody of the child. DHR provides services only for the legal parents of a child. The father admitted at trial that he knew when the child was taken into protective custody that he must establish his paternity of the child in order to have visitation with the child or to obtain custody of the child.
When the child was taken into protective custody, she was placed in foster care in the home of K.M. and J.M. When the child was placed in that foster home, K.M. was described to the DHR social workers as a distant relative of the mother's. At trial, the witnesses were unable to explain the complicated familial connection between the mother and K.M. The best attempt to explain the connection suggested that K.M. had apparently at one time been married to an uncle of one of the mother's cousins. It is undisputed that the mother and K.M. are not related by blood, that any relation-by-marriage was tenuous at best, and that the two women had not met before the child was placed in foster care in K.M.'s home.
The child was declared to be a dependent child, at a hearing conducted in May 1997. The mother had been released from jail at that time and was in a drug-treatment facility; she did not complete that program. The mother testified that she did not know about the dependency hearing but that the DHR social workers knew she was in drug treatment. The father testified he did not receive notice of the dependency hearing either. We note that at that time, the father had made no effort to establish his paternity of the child.
After the child was declared dependent and placed in DHR's custody, the DHR social workers were unable to contact the father. The mother did not know where the father was; he had moved several times. The father had told Kennedy in February 1997 that he was living with an aunt in Alabama but that he did not know the aunt's address. The father did not inform DHR of his whereabouts until early 1998.
In June 1997, Kristy Holt was assigned to be the social worker for this case. Holt testified that when she first received the assignment of this case, she had no knowledge of the whereabouts of either the mother or the father. In July 1997, the mother first contacted Holt to arrange visitation with the child. Holt testified that the mother visited the child although she knew that after the visit she would be arrested on several outstanding warrants. The mother was arrested after that July 1997 visit. She remained incarcerated until October 1997. It is not clear from the record why the mother was released from jail; at one point, both she and Holt thought that the mother would serve some time in prison.
The mother continued visiting with the child while she was in jail because K.M. *170 took the child to the jail to visit the mother. At trial, it was undisputed that K.M. and the mother worked together to minimize the confusion and stress for the child. The women decided to have the child call the mother "Momma" and K.M. "Mommy."
We note that C.C., the mother's ex-husband, also occasionally took the child and his and the mother's son to visit the mother. At that time, the child's paternity was in question. C.C. told the social workers that there was a small chance that he was the father of the child; however, C.C. believed that the child's father was R.M. At trial, C.C. testified that he tried to facilitate a relationship between his son and the child, who are half-siblings.
Holt testified that the mother had drug and alcohol problems during the time she worked with her. Holt testified that she asked the mother to take four random drug screenings. Holt informed the mother that those drug-screening tests must be taken within 24 hours of the request for the test. The mother took the first test immediately after the request; the results indicated that the mother was positive for illegal drug use. On each of the remaining three drug-screening requests, the mother waited four days after the request to take the tests; all of those tests were negative.
Holt eventually learned that the father had been incarcerated from May 15, 1997, through October 27, 1997, for failure to pay child support for a child from his first marriage. Holt testified that the father's girlfriend telephoned her in March 1998 regarding the father's obtaining custody of the child. Holt informed the girlfriend that the father must establish his paternity of the child in order to receive DHR services or visitation rights or custody of the child.
On April 7, 1998, DHR filed a petition to transfer custody of the child to K.M. and J.M. Also in April 1998, the father first contacted Holt. The father wanted to obtain custody of the child. Holt informed the father, as she had previously informed his girlfriend, that he must establish his paternity of the child. On May 5, 1998, the father filed a petition for custody of the child; that petition stated that the father was the natural father of the child and that paternity was undisputed. The trial court conducted a hearing. The mother's attorney did not attend that hearing; however, the trial court noted that "[the mother's attorney] was advised of all of the matters which were discussed and decided at the hearing, and he gave his approval."
On June 5, 1998, the trial court entered an order awarding temporary custody of the child to K.M. and J.M. and divesting DHR of custody of the child. That order indicates that the transfer of temporary custody to K.M. and J.M. was made with the agreement of all the parties. However, the father, who was represented by counsel at the hearing, testified that he did not agree to the transfer of temporary custody to K.M. and J.M. None of the parties appealed from the June 5, 1998, order awarding K.M. and J.M. temporary custody of the child.
In its June 5, 1998, order, the trial court also ordered that the father submit to paternity testing in order to establish the child's paternity. The mother was ordered to pay child support. The father was ordered to pay child support on the first day following a determination of his paternity.
The paternity tests established the father's paternity of the child. In August 1998, the trial court entered an order awarding the father supervised visitation with the child and ordering him to pay $150 per month in child support. At that time, the father lived in Minnesota. The trial court also ordered that a home evaluation *171 be conducted on the father's home, pursuant to the Interstate Compact on the Placement of Children, §§ 44-2-20 et seq., Ala.Code 1975, and that the results of that evaluation be submitted to the trial court.
In July 1998, K.M. and J.M. filed a petition to terminate the parents' parental rights. K.M. and J.M. want to adopt the child.
In early April 1999, the trial court conducted a hearing on the father's petition for custody of the child and K.M. and J.M.'s petition to terminate parental rights. At the time of trial, the child was three years old and had lived with K.M. and J.M. for two years.
The mother admitted at trial that the DHR social workers had told her that she must complete an inpatient drug-treatment program and obtain a job in order to regain custody of the child. The mother testified that she had had a problem with cocaine, marijuana, prescription pain medications, and alcohol. During the two years the child was in the custody of either DHR or K.M. and J.M., the mother voluntarily left three different treatment facilities. Kristy Holt testified that the mother told her that she did not need or want drug-rehabilitation treatment; Holt also testified that after temporary custody was transferred to K.M. and J.M. in June 1998, the mother had a difficult time coping and expressed that she had a problem with alcohol.
Immediately after her October 1997 release from jail, the mother tested positive for marijuana use after a random drug-screening test. The DHR social workers attempted to assist the mother in obtaining treatment for her illegal-drug problem. The mother testified that she had refused to attend an inpatient drug-treatment facility because she had just gotten out of jail and such a facility, she felt, would just be "more time."
The mother testified at trial that on her own she had quit using illegal drugs and that she had last used cocaine in February 1997. The mother testified that she had stopped drinking alcohol in August or September 1998. She testified that she had been receiving treatment at a methadone clinic since February 1999 to help her stay off prescription pain medications that had been prescribed for her scoliosis. At trial, the mother denied that she had a current problem with illegal drugs or alcohol. The mother testified that she had had an alcohol problem in the past and that she presently drank alcohol only occasionally. The mother's ex-husband testified that he did not believe that the mother was presently using drugs and that he felt secure in leaving their son with her for visitation.
The mother testified that she was working to obtain a GED certificate. At the time of trial, she had been living with her boyfriend for approximately one year. She was not employed, and she relied on the boyfriend for her support. She testified that the boyfriend was willing to support her and the child.
The father testified that he wanted custody of the child. At trial, he complained that DHR social workers had failed to provide him with services toward reunification and that he had been denied visitation with the child until June 1998. The DHR social workers testified that DHR policies provide for services or visitation only for legal parents of a child. The father testified that he had not established his paternity of the child because he believed he needed his own birth certificate to do so, and that his father had been slow in assisting him in obtaining his birth certificate. The father obtained a copy of his birth certificate in January 1998. At trial, the father testified that DHR had requested that he sign a release so that DHR could *172 perform a background check on him; however, he testified that he "forgot" to return that paperwork to DHR.
The father testified that he is a self-employed construction worker and that he earns $4,000 per month. Until a week before the trial, he lived with his girlfriend and the girlfriend's children; the girlfriend had not yet obtained a divorce from her current husband. Evidence presented at trial indicated that three "CA/N reports" (apparent reports indicating child abuse or neglect) had been filed regarding the girlfriend's children during the time they lived with the father and the girlfriend. On the objection of the father's attorney that those reports contained hearsay information, the trial court did not allow any evidence regarding the details of those reports. However, the father testified that the girlfriend had lost custody of her children the week before the trial in this case.
A social worker in Minnesota recommended that the child not be placed with the father in his home in Minnesota. Again, some of the reasons for that recommendation were excluded as having been derived from hearsay information. However, the Minnesota social worker testified that the father had agreed to take the court-ordered drug-screening tests, but that he had not done so. The father testified he could not afford the $130 cost for the five or six tests.
The Minnesota social worker also testified that the father had moved from the home she had evaluated, that he had refused to cooperate with her attempts to evaluate the next home he lived in, and that he had moved again only days before trial. It appears that the father was asked to leave the first home he was renting. He testified that he lived in the second residence for only a month, while he looked for a better place. At the time of trial, he testified he had just moved to a three-bedroom home, in which, he said, he had room for the child.
The father's ex-wife testified that the father was allowed only telephone visitation with their seven-year-old son. She testified that the father had lost his standard visitation privileges after he had harassed the ex-wife's grandmother, had threatened to take the son, and had threatened to kill the ex-wife.
The father admitted that, since he had known the mother, he had used illegal drugs. He first admitted to using only marijuana, but he later admitted to also using prescription drugs. He first testified that he "experimented" with cocaine; he later testified that, two years before the trial, he had had a "problem" with his cocaine use. He denied using cocaine in the two years before trial.
The father testified the time he had spent in jail for failure to pay child support had left him a changed man and that he had "sorted out" his life. However, on the second day of trial, the father took a drug-screening test; it was positive for marijuana use. He admitted using marijuana on two occasions after filing for custody of the child. When asked whether his time in jail changed his use of illegal drugs, the father testified that it had "dramatically" reduced his illegal drug use.
The father testified that he had been arrested "quite a few times" on charges such as driving under the influence, harassment, and nonpayment of child support. At the time of trial, the father's Alabama driver's license had been revoked and his Minnesota driver's license had been suspended after he refused to take a sobriety test when was arrested on DUI charges in May 1998.
The father testified that he had paid $750 in child support since the issuance of the August 1998 order that required him *173 to pay $150 per month for support of the child. The court clerk's records indicated that $299 had been paid toward the father's child-support obligation. The father testified that his girlfriend paid the household bills and that he was certain she had receipts for more than the $299 in child-support payments reflected in the record. The father acknowledged that he did not know whether his child support was paid, because he did not write the checks or make the payments himself.
The father admitted he had on several occasions threatened to do physical harm to the mother and that he had made those threats while he was using cocaine. The mother testified that the father had threatened to take the child. One of the social workers also testified that on one occasion, after the child had been placed in protective custody, the father had threatened to take the child.
The trial court heard testimony from the parties and their witnesses over the course of several days. At the close of the evidence, the court heard the attorneys' closing arguments and questioned the various parties regarding the past and present circumstances of the parents, the possibility of maintaining the then existing custody arrangement, and the viability of alternate placement of the child. At the end of that questioning, the judge stated that he would consider all of the evidence, the arguments, and the recommendation of the child's guardian ad litem.
The child's guardian ad litem submitted a detailed report. She stated that the mother had submitted to two drug-screening tests that the guardian ad litem had requested. The results of both of those tests were negative; however, the dates of those tests are not included in the record. The guardian ad litem opined that the father had been less than candid about his drug use and his criminal background.
On June 8, 1999, the trial court entered an order containing a detailed finding of facts and analysis of those facts. The trial court again found the child to be dependent, and it terminated the parents' parental rights.
"Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
"Where a nonparent petitions to terminate a parent's parental rights, the *174 trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
On appeal, the father first argues that the trial court erred in terminating his parental rights because, he says, DHR did not "facilitate family reunification" for him and did not assist him in obtaining custody of the child. DHR is not a party to this action; K.M. and J.M., who were awarded temporary custody of the child, are the parties who petitioned for the termination of the father's parental rights.
The father complains that he was not given notice of the dependency hearings and that he received visitation rights only after he had filed his petition for custody in May 1998. We note that for much of the time that the child was in protective custody, the DHR social workers did not know of the father's whereabouts. The father did not live in Alabama, he moved frequently, and he did not provide DHR social workers with information regarding how to contact him.
In his brief on appeal, the father ignores the fact that his paternity was not established until June 1998 and that it was established then only after court-ordered paternity tests. The father admitted that he knew as early as February 1997 that he had to establish his paternity of the child in order to receive visitation rights. The DHR social workers testified that the father was not provided with services because he had not established his paternity of the child. Thus, many of the father's complaints relate to the time during which he was not the legal parent of the child.
The father argues that after his paternity was established, the Alabama DHR social workers did not provide "reunification" services; however, at that time, the father was living in Minnesota. Further, on June 5, 1998, K.M. and J.M. received temporary custody of the child. The father's paternity was established after that date. As of June 5, 1998, DHR did not have custody of the child and, according to its policies, was not required to provide any services to either parent. Kristy Holt testified that "when custody was given to [K.M. and J.M.], in effect, my case [was] closed," except to pursue the court-ordered Interstate-Compact evaluation of the father's home. When asked what efforts she had made to "reunify" the father and child after the father's paternity was established, Holt replied that, at that point, all she could do was wait on the results of the home evaluation that was to be conducted in Minnesota. Holt testified that the need for services such as parenting classes or drug-education classes would be assessed through the performance of the home evaluation in Minnesota.
The social worker from Minnesota performed a home evaluation of the first of the father's three residences in Minnesota. The father did not cooperate with further home evaluations after his move from that first residence. The Minnesota social worker recommended that the child not be placed in the father's home.
*175 In its judgment, the trial court found that the father had a history of substance abuse, that he failed to comply with court orders to submit to drug screenings, that his interaction with the child had been minimal, that he had failed to support the child, and that the Minnesota social worker recommended not placing the child with the father because the father had failed to cooperate with reasonable requests regarding the home evaluation and had refused to cooperate in drug testing, and because of "other concerns." The court specifically found that the father did not have the ability to effectively care for the child. The trial court found that DHR had made reasonable efforts toward the reunification of the father with the child and that those efforts had failed. After reviewing the record, we must conclude that the father has failed to demonstrate that the trial court's judgment was error.
The father also argues that the trial court's judgment must be reversed because the trial court considered an incorrect factor in terminating his parental rights. In its judgment, the trial court stated that it had considered the child's need for stability and her "retention in her same [home] environment." The father argues that the trial court, in determining whether to terminate his parental rights, should not have considered the child's need for stability and the benefits of leaving her in the home she has been in for two of her three years.
In its judgment, the trial court evaluated the facts of the case by applying the two-pronged test set forth in Ex parte Beasley, supra. The trial court stated that it had considered § 26-18-7, Ala.Code 1975, which sets forth factors to consider regarding whether to terminate paternal rights. The trial court also cited the general caselaw holding that a parent has a prima facie right to custody of his or her child and that parental rights should be terminated only on clear and convincing evidence that the termination of parental rights is in the child's best interests. See M.W. v. State Dep't of Human Resources, 761 So.2d 246 (Ala.Civ.App.1999); A.R.E. v. E.S.W., supra.
After making its findings of fact, the trial court determined that the child was dependent. The trial court then considered and analyzed the law regarding the termination of parental rights. The trial court rejected the alternatives to termination of the parents' rights and determined that the child's best interests would be served by terminating the parents' parental rights. See Ex parte Beasley, supra. The trial court cited the child's need for security and stability in reaching its determination that the termination of the parents' parental rights was in the child's best interests. The child has lived two of her three years with K.M. and J.M. The trial court specifically found that the parents were unable to care for the child and that that condition was unlikely to change in the foreseeable future. The father does not challenge that finding on appeal. The father has not established that the trial court erred in considering the stability and security that the child's present placement affords her, as a factor in determining what is in the child's best interests.
We note that as a part of his argument, the father cursorily states that "there were viable alternatives to termination"; however, he failed to make any specific argument regarding what those alternatives to the termination of his parental rights might be. It is not the function of this court to create arguments for an appellant or to search the record on appeal to find evidence that would support the appellant's argument. McLemore v. Fleming, 604 So.2d 353 (Ala.1992); Brown *176 v. Brown, 719 So.2d 228 (Ala.Civ.App. 1998).
However, we reach the issue because the mother, in her brief on appeal, raises and argues this issue. The mother cites V.M. v. State Dep't of Human Resources, 710 So.2d 915 (Ala.Civ.App.1998), for the proposition that the termination of her parental rights must be the least drastic alternative and that all alternatives to the termination of her parental rights must be rejected. She argues that although it is K.M. and J.M., and not DHR, who are the petitioners in this action, the standard set forth in V.M., supra, should be applied in this action.
Initially, we note that at least two of the witnesses at trial testified that, as of the time of the trial, they would be willing to have the child placed with them. Neither of those witnesses had been available at the time the child was first placed into protective custody. Both witnesses admitted that they had not approached or contacted anyone at DHR about being considered as an alternative placement for the child.
In her brief on appeal, the mother argues that her aunt, J.J., was a viable relative resource with whom DHR could have placed the child. Initially, we note that when the child was first placed into DHR's custody in February 1997, no relatives were willing to take the child. The record indicates that J.J. first contacted Kristy Holt on October 2, 1997, about being considered as a placement alternative for the child. Holt testified that J.J. told her that she had been a licensed foster parent in the past; Holt testified that in October 1997, J.J. was not on DHR's list of licensed foster parents. On October 2, 1997, Holt gave J.J. an application packet and releases to provide DHR with authority to check whether she had a criminal background.
Holt testified that most relatives who apply for placement of a relative's child "hound" her about being approved for placement. However, J.J. returned the application packet to Holt on May 11, 1998, over seven months after she had contacted Holt and had received the paperwork. Holt testified that upon receiving J.J.'s paperwork on May 11, 1998, she immediately "sent out" the releases, in order that a background check could be performed, and sent letters to J.J.'s references. However, Holt received no responses from those sources before the May 29, 1998, hearing on K.M. and J.M.'s petition seeking temporary custody of the child. Thus, Holt had little information about J.J. and had not had an opportunity to conduct a home evaluation. Holt testified that by the time she received a response on the required background check and responses from J.J.'s references, the trial court had already awarded temporary custody of the child to K.M. and J.M.
J.J. testified that she returned the paperwork to DHR in February 1998. She testified she delayed returning the paperwork to DHR because she had had gallbladder surgery in 1997. J.J. later testified that she had only had tests performed and that in fact she could have taken custody of the child during that time. On cross-examination, J.J. acknowledged that she "probably" could have returned the paperwork during that same period.
At trial, the mother's attorney and J.J. represented that J.J. had been a licensed foster-care parent at all relevant times. However, on the second day of testimony, Holt testified that, as of the day before, J.J. was still not listed as a licensed fostercare parent. Holt testified that after initial licensing, a foster home must be reevaluated *177 annually.[2]
J.J. returned the paperwork only days before the hearing on K.M. and J.M.'s petition for temporary custody. The child remained in a foster home during the seven months J.J. retained that paperwork without returning it to the DHR social workers. The trial court could have concluded that J.J.'s interest in the child was minimal, given the length of time it took her to return the paperwork required for DHR to place the child in her home. We cannot say that the trial court erred in rejecting J.J. as an alternative relative placement for the child.
The mother also argues that her due-process rights were violated because, she says, she was not provided with notice of a May 1997 dependency hearing. Initially, we note that the record contains no evidence regarding that hearing or whether the mother received notice of that hearing. This court will not presume error; it is the responsibility of the appellant to ensure that the record contains sufficient evidence to warrant a reversal. State ex rel. Gibson v. Gibson, 555 So.2d 1092 (Ala. Civ.App.1989). Further, the mother never appealed the dependency finding. Thus, this issue is not timely raised.
We also note that the mother argues that the DHR social workers knew of her whereabouts until the day before that hearing; however, she does not argue, nor does the record indicate, that the social workers had any responsibility to notify the mother of a court hearing. Further, the child was again declared dependent at the May 20, 1998, hearing on K.M. and J.M.'s petition for temporary custody. The June 5, 1998, order following that hearing indicates that the mother was present at the hearing and that she stipulated to the dependency determination and to the transfer of temporary custody of the child from DHR to K.M. and J.M. Although the mother's attorney was not present at that hearing, the trial court's order states that the mother's attorney was later advised of the matters decided at that hearing and that he approved of the action taken at that hearing.
Last, the mother argues that DHR failed to make reasonable efforts to rehabilitate her and reunite her with her child, and that the evidence does not support the termination of her parental rights.
The mother argues that DHR gave her only four months to comply with its requests; she is referring to the period after she was released from jail in October 1997 and before the April 1998 petition to transfer temporary custody of the child to K.M. and J.M. She states that DHR "quit working with her" after she failed to do only "one thing": participate in inpatient drug treatment.
However, the record reflects that DHR has been involved with the mother since the child's birth in March 1996. The mother received services from DHR until April 1998, when DHR filed the petition to transfer temporary custody of the child to K.M. and J.M. The mother voluntarily quit three different drug-treatment programs during the time that DHR social workers were trying to help her with her addiction to illegal drugs.
*178 The mother testified that the DHR social workers asked her "to go to a drug rehab and to get an apartment and ... get stable." However, in November 1997, the mother failed a drug-screening test; she passed three other drug screenings after waiting four days after the request was made to take the tests. The DHR social workers testified that the mother had been evaluated and needed to complete an inpatient drug-treatment program; they testified that her completion of drug treatment and staying off drugs was the first step toward reuniting the mother and the child. However, the mother refused to go to an inpatient treatment facility. Holt testified that she informed the mother that she needed to complete a drug-treatment program in order for the social workers to analyze and assist the mother with her other needs.
In her brief on appeal, the mother argues that DHR's refusal to "work with her" after temporary custody was awarded to K.M. and J.M. was not "reasonable." However, the mother admitted that she had not completed a drug-treatment program, which the social workers considered the first step in establishing her stability. Holt testified that she had informed the mother that she would not recommend that she regain custody of the child until she received treatment for her drug use. Also, Holt testified that although she knew the mother loved and wanted the child, the mother never asked what she needed to do to regain custody of the child; thus, the mother never requested reunification services. The mother told Holt at the May 20, 1998, dependency hearing that she would prefer that K.M. and J.M., rather than the father, have custody of the child. After temporary custody of the child was transferred to K.M. and J.M., DHR no longer had custody of the child. Holt testified that at that point DHR did not provide further services for the parents. We cannot say the trial court erred in determining that DHR had made reasonable efforts toward rehabilitating the mother and that those efforts had failed.
At the time of trial, the mother testified that she was trying to obtain a GED certificate. The mother has never been employed. She testified that shortly before trial, her brother and his girlfriend had paid her to clean their home. At the time of trial, the mother was living with her boyfriend and was dependent on him for her support. The mother presented no evidence regarding how she would support herself or the child if her relationship with the boyfriend ended.
In its judgment terminating the mother's parental rights, the trial court stated that although the mother had attempted to prove that she had "cleaned up her act," the court found that the mother had an extensive history of substance abuse and had provided little support for the child. The trial court also found that the mother's lifestyle remained unstable in that she lived with her boyfriend, she did not drive, she was not employed, and she was entirely dependent on the boyfriend for her own support. The trial court concluded that "[c]learly the conduct of the mother from [the child's] birth through the date of trial warrants the termination of her parental rights," and that the child's best interests would be best served by terminating her parental rights.
The evidence at trial indicates that the child has lived with K.M. and J.M. for two of her three years. K.M. and J.M. want to adopt the child. The trial court considered the parents' past and present circumstances and conduct and the child's need for stability and security. The trial court concluded that the parents' circumstances were not likely to change in the foreseeable future and that the child's best interests *179 would be served by the termination of the parents' parental rights.
The trial court's judgment terminating the parents' parental rights is entitled to a presumption of correctness on appeal; we cannot say that the trial court's judgment is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra.
AFFIRMED.
CRAWLEY, J., concurs.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur in the result.
NOTES
[1] From the time the child was born until July 1998, when his paternity of the child was established, R.M. was the putative father of the child. However, for the purposes of this opinion, R.M. is referred to simply as the "father."
[2] We note that in May 1998, two children were placed with J.J. and that J.J. characterized this as a foster placement. However, Holt testified that those two children were never in DHR custody and that, therefore, a DHR social worker did not have to do an evaluation of J.J.'s home. Holt testified that an "in-home service worker" helped place the children in J.J.'s home and that the placement of those two children was not a DHR placement. The record indicates that J.J. was awarded temporary custody of those two children after their mother and their mother's attorney had agreed to the placement.