865 So.2d 1188 (2003)
B.S.
v.
CULLMAN COUNTY DEPARTMENT OF HUMAN RESOURCES.
2010977.
Court of Civil Appeals of Alabama.
March 7, 2003.
Certiorari Denied May 16, 2003.
*1189 G. Edward Coey, Hanceville, for appellant.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and Lynn S. Merrill, asst. atty. gen., Department of Human Resources, for appellee.
Alabama Supreme Court 1021017.
*1190 PER CURIAM.
B.S. ("the mother") appeals the termination of her parental rights to K.M.R. ("the child").[1]
The mother was known to the Department of Human Resources as an infant, when she was removed from the home of her biological parents and placed in foster care. The mother was later adopted. The mother has two children other than the child as to whom her parental rights were terminated; none of the mother's children lives with her. The mother's oldest child, L.M.R., a daughter, lives with her father. The mother's other child, A.R., a son, lives with J.R., the mother's biological sister, with whom he was placed shortly after his birth.
In May 1994, the adult-protective-services division of the Cullman County Department of Human Resources (hereinafter "DHR") was informed that the mother, who is mildly mentally retarded, was living in a home unfit for habitation with a boyfriend, J.T.; the mother had been supporting herself and J.T. with her Social Security disability benefits. DHR investigated and found the home to be filthy; windows were missing and dogs penned inside. Although the mother was informed that J.T. was mismanaging her money and was told that she could have a conservator appointed for her, she indicated a desire to remain with J.T.
In October 1996, the mother gave birth to the child. Based on a report from a nurse at the hospital at which the child was born, and also based on discussions with J.M.T., the mother's biological mother, and J.R., her sister, DHR filed a dependency petition and was awarded legal custody of the child. DHR first investigated placing the child with T.W., another sister of the mother's with whom the mother was living at the time. However, T.W.'s husband, W.W., had been found guilty of sexual misconduct. Therefore, DHR refused to place the child in T.W.'s home.
DHR placed the child with J.R.; that placement continued for nine months, after which time J.R. requested that the child be removed from her home. The child was then placed with the mother's cousin, J.G. However, the child was removed from J.G.'s home after approximately six months, when the Morgan County Department of Human Resources, which was supervising the placement, discovered that the cousin had misreported her income and was financially unable to assume responsibility for the child. DHR then placed the child in a foster home for a time; the foster parents requested that she be removed from their home. Finally, the child was placed with her current foster family. She had resided with that family for over two years at the time of the termination hearing. Although test results for the child were not available at the time of the termination hearing, the child suffers from developmental delays, and she exhibits some behavioral problems.
Judy Sandlin, a DHR caseworker, testified on behalf of DHR. Sandlin testified that she had been assigned to this case in May 2001, after DHR had decided to petition to terminate the mother's parental rights. Sandlin testified that she had never seen or spoken with the mother before the termination hearing. According to Sandlin's testimony, which was based upon *1191 a court report she prepared that summarized the records in DHR's file on the child,[2] the mother visited the child only sporadically during the five years the child was in DHR's custody, in spite of the fact that DHR urged the mother to visit the child and had offered to provide her transportation to those visits. The mother never requested transportation to visit her child. In the 12 months before the termination hearing, the mother neither visited nor contacted the child.
At the time of the termination hearing, the mother had been married to S.S. for five years. S.S. testified that he had not been supportive of the mother's visitation with the child because, he said, he did not want either the mother's or the child's "heart broken" if they were not ultimately reunited.
Sandlin testified that the mother's sporadic visitations with the child were observed by DHR caseworkers and that the caseworkers had made notes concerning their observations of those visitations. Sandlin specifically noted that at the visitations, the mother's behavior was reported to be "child-like," and that S.S. often slept during the visits. In a visit Sandlin specifically described, the mother failed to intervene when the child colored the furniture with markers.
Sandlin testified that the observations of the mother's visitations with the child, coupled with the mother's failure to visit the child regularly, contributed to DHR's decision to seek to terminate the mother's parental rights. Another basis for DHR's decision was the opinion of two professionals that the mother was not capable of independently caring for herself or a child.
The mother has an IQ of either 58 or 61, depending on which evaluation is consulted; those scores place her in the mildly mentally retarded range. The mother was first evaluated in 1995 by Kenneth P. Sullivan, a psychologist, in connection with her son's custody determination. Dr. Sullivan's testing indicated that the mother had a full-scale IQ of 61. Dr. Sullivan commented that persons like the mother could participate in their own careand even the care of childrenprovided they were given a structured environment and close supervision. Dr. Sullivan opined that the mother in this case was unable to care for herself or for a child without constant supervision. Dr. Sullivan noted that persons like the mother are incapable of managing their own finances or other aspects of self-care like food preparation, cleaning, and arranging transportation. Dr. Sullivan noted that the mother could likely assist in taking care of her infant son if she were placed in a structured environment "in which skilled individuals maintained primary responsibility for the [son], while permitting [the mother] to share in care-taking tasks." However, Dr. Sullivan's assessment was that the mother could not independently provide adequate care for a child and that, in fact, being left alone with the mother would place an infant in peril.
In 1999, the mother's intelligence was evaluated in connection with this action; Patrick Dunne, a licensed professional counselor, performed that evaluation. Dunne determined that the mother had a full-scale IQ of 58, and that she was mildly mentally retarded. Dunne opined that the mother was unable to effectively parent a child, citing the fact that the mother depended on others for her own care and *1192 that she had difficulty understanding that her limited mental capacity was the reason her children had been removed from her custody. Dunne commented that the mother's insight and judgment were limited and that she did not fully understand her children's needs. He also noted that the mother appeared to have feelings for the child, but he stated that "[h]er bond with her other two children appeared to be quite shallow." Dunne noted that there is no treatment for mental retardation, and he stated that the mother's limitations were unlikely to ever improve. Dunne also believed that neither individual nor family counseling was likely to benefit the mother.
The mother, who was 40 years old at the time of the termination hearing, testified that she wanted the opportunity to raise her child. The mother testified that she had raised her first child, a daughter, until she and her first husband divorced when the daughter was eight years old. The mother said that she knew how to change diapers, how to cook for her family, and how to keep a house neat and clean. The mother has never worked, and she receives Supplemental Security Income ("SSI") benefits.
The mother said that she had not visited the child in the year before the termination hearing, and she indicated that she did not know why she had not visited the child. The mother also admitted that she had not sent the child cards or gifts, but she stated that she planned to start doing so.
The mother stated that S.S., whose driver's license had been suspended, expected to have that license reinstated soon. The mother explained that she could not call DHR to arrange for transportation to visitation, which she admitted DHR had offered, because, she said, she had no telephone. The mother testified that she uses her neighbor's telephone when necessary, but that the neighbor does not have long-distance service.[3]
S.S., the mother's husband, testified that he and the mother married in July 1997. S.S. testified that the mother cooked meals and cleaned the home in which the couple lived; he said that the mother was a good cook and a fairly good housekeeper. S.S. explained that he was the driver in the household, and that he had had his driver's license suspended for one year after he was convicted of driving under the influence. S.S. also stated that the mother was a loving person and that he believed the child would be well-cared for by her.
S.S. commented on the relationship between the mother and her eldest daughter; he said that the two got along fairly well during their bimonthly visitation weekends, in light of the fact that the daughter is a teenager. When specifically questioned about his readiness to have a preschool child in his home, S.S., who was 60 years old, admitted that he had not always been supportive of the mother's regaining custody of the child, and that at one time, he had been against the idea because he thought he was too old to have a young child around. However, S.S. testified that he was, at the time of the termination hearing, committed to helping the mother regain custody of the child; S.S. believed that he could handle the stress and the financial strain that would inevitably result from such a change in his and the mother's lives.
S.S. also testified that he had been diagnosed as a schizophrenic 30 years before *1193 the termination hearing. S.S. stated that he was taking antipsychotic and antidepressant medication, and that he also took medication for high blood pressure and arthritis.
B.A.S., S.S.'s sister, also testified at the termination hearing. B.A.S. holds a bachelor's degree in business administration and is retired after serving 20 years in the Air Force as a human-resources manager. B.A.S. testified that the mother is a warm and loving person and that she considered the mother more of a sister than a sister-in-law. B.A.S. said that she lives near the mother and that she would be available to help the mother should the need arise. B.A.S. has assisted the mother and S.S. with transportation since S.S.'s driver's license was suspended.
At the termination hearing, the mother's attorney asked B.A.S. whether she had ever considered the possibility of taking the child, and she responded "not until this second." In her later testimony, B.A.S. indicated that she was willing to take the child if the mother approved. B.A.S. testified that she has known about the child since almost the beginning of the mother's marriage to S.S., five years before the termination hearing. B.A.S. testified that she had met the child on only one occasion during a visitation with the mother. B.A.S. could not provide any information regarding how long before the termination hearing her only meeting with the child occurred, how long that visitation was, or who was present during the visitation. The only details of her meeting the child to which B.A.S. could testify was her impression that the child was "cute," and her recollection that the child was already walking at the time of the visitation. The child was almost six years old at the time of the termination hearing.
Sandlin testified that she had not known about B.A.S. and that DHR had not investigated B.A.S. as a possible placement for the child. Sandlin testified that the fact that B.A.S. was not related to the child by blood did not preclude her from being considered as a possible placement resource for the child. Sandlin explained where a possible placement alternative is unrelated to the child by a blood relation, the determination whether to place the child with that person depended upon the facts of the particular situation.
In its judgment, the trial court found the child to be dependent, and it concluded that there were no viable alternatives to the termination of the mother's parental rights. The court specifically found that placement of the child with relatives was not a viable alternative and that there were no other less restrictive alternatives to the termination of the mother's parental rights.
Section 26-18-7, Ala.Code 1975, sets forth the statutory authority for the termination of a parent's parental rights; it provides:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:

*1194 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.

"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
(Emphasis added.)
This court has stated that:
"Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable *1195 efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
"Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
On appeal, the mother argues that the trial court erred in terminating her parental rights. Among the factors the trial court considers in making the difficult decision to terminate a parent's parental rights are the parent's mental deficiency, if applicable, whether reasonable efforts to rehabilitate the parent have failed, and whether the parent has failed to visit or maintain consistent contact with the child. See § 28-18-7, Ala.Code 1975. The record clearly reflects that the mother suffers from a mental deficiency that two professionals have determined precludes her from being capable of adequately assuming the role of a parent. The record also indicates that the mother had visited the child only sporadically until a year before the termination hearing and that she had failed to visit or maintain any contact with the child during the year before the termination hearing.
We are not unswayed by the mother's argument that a mentally retarded person is not, for that reason alone, an unfit parent. Indeed, Sandlin admitted that mentally retarded individuals can rear children successfully. However, as Sandlin noted, DHR had the opinions of two experts that had concluded that this mother, because of her limited mental capacity, could not successfully maintain an independent lifestyle for herself, much less care for her own needs and the needs of a child who is dependent upon her for her care. Although, as the mother points out in her brief on appeal, Dr. Sullivan focused on the mother's inability to care for the needs of an infant who is totally dependent on the care of others, Dunne indicated that, in his opinion, the mother could not rear "an adolescent, let alone a preschool child."
DHR must, in its effort to reunite families, provide services to parents whose children have been removed from their custody. § 26-18-7(a)(6); D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 589 (Ala.Civ.App.1999). The mother argues that simply because she is mentally retarded, DHR failed to provide her appropriate services such as parenting classes or in-home assistance to determine whether she could develop the necessary parenting *1196 skills. However, we cannot hold that DHR must provide services that an expert has determined will not benefit the parent. Requiring DHR to provide parenting classes and in-home assistance to a mother who, based on two professional opinions, will not be able to master the necessary skills to successfully parent on her own, would place an undue burden on an agency already struggling with its duty to rehabilitate those parents and reunite those families who can be aided by its assistance.
The record clearly supports the trial court's determination that the child is dependent. The evidence also supports the trial court's finding that the mother is currently, and will be for the foreseeable future, unable to discharge her responsibilities as a parent. See § 26-18-7(a), Ala. Code 1975.
The mother argues that DHR has improperly failed to consider placing the child with her sister-in-law, B.A.S., as a viable alternative to the termination of her parental rights. The mother contends that DHR is required to demonstrate that it has made "recent attempts to locate viable alternatives," and that in failing to consider B.A.S., DHR has failed to do so. See V.M. v. State Dep't of Human Res., 710 So.2d 915 (Ala.Civ.App.1998) (holding that DHR must present evidence of recent attempts to locate alternatives to the termination of the parent's parental rights). However, for the reasons discussed below, we conclude that the evidence does not demonstrate that the trial court abused its discretion in rejecting B.A.S. as a viable placement for the child and in concluding that DHR had demonstrated that there were no alternatives to the termination of the mother's parental rights.
B.A.S. is not related by blood to the child, nor is she married to one of the child's biological or adoptive relatives. B.A.S. is the sister of S.S., the mother's second husband; S.S. is not the child's biological father. In the vast majority of cases involving the termination of a parent's parental rights, relatives of the child are examined as possible placement alternatives. There does not seem to be a requirement that an alternative placement resource be related to the child in a degree closer than that of a stepfamily relationship. In fact, Sandlin testified that the fact that a person is not related to a child by blood does not necessarily prevent that person from serving as an alternative placement for the child, but she stated that the appropriateness of such a placement depended upon the particular facts of each situation.
This court is not imposing a rule that would prevent, in all cases, a person unrelated to a child by blood from serving as an alternative placement resource for the child. In many situations, stepfamily relationships are as close or closer than family relationships between those related by blood. For example, in a situation in which a child shares a close relationship with her stepfather and his family, it might be appropriate to investigate members of the stepfamily as possible placement resources for the child. A determination of whether a stepfamily member should serve as a placement alternative should initially be made by DHR social workers, and later by the trial court. Such a determination should depend upon the relationships involved and the unique facts of each case.
The facts of this case, however, do not support the placement of the child with B.A.S. The child was almost six years old at the time of the termination hearing. DHR had gone to extensive lengths to place the child, who has some developmental delays and behavioral problems, before the termination petition was filed. The child has been in a total of five homes in the almost six years since her birth, when *1197 she was removed from the mother's custody.
The child has never lived with the mother's husband, S.S., and she is acquainted with him only from his accompanying the mother during her visitation with the child; that visitation was infrequent and the evidence indicated that S.S. had slept during at least some of those visitations. The child is also unfamiliar with B.A.S. and the other members of S.S.'s family. According to B.A.S.'s testimony, the child met B.A.S. on only one occasion during a visitation with the mother. There is no evidence that the child remembers B.A.S, and B.A.S. does not have any true recollection of that meeting.
B.A.S. testified that she had not had any contact with DHR, other than during the three months when she had custody of a nephew. Therefore, the record demonstrates that B.A.S. was aware of the possibility of serving as an alternative placement for a child.
The mother had been married to B.A.S.'s brother for almost five years at the time of the termination hearing. B.A.S. has known for years that the child has been in relative placements and foster care since her birth. The mother was also aware of the possibility of alternate placements for the child; two unsuccessful placements had been with members of the mother's family. In spite of that knowledge, neither B.A.S. nor the mother made any effort to ask DHR to consider B.A.S. as a possible placement for the child. In fact, B.A.S. testified at the termination hearing that until she was asked whether she would consider taking the child, she had never even considered the possibility of taking the child into her home.
Although DHR has a responsibility to investigate alternate relative placements for a child, that obligation does not entirely alleviate the responsibility of the parent who purports to oppose the termination of his or her parental rights of making DHR social workers aware of alternative placement possibilities. In order to prevent the termination of his or her parental rights or regain custody of a child, a parent is often required to demonstrate his or her willingness and ability to meet the needs of the child by, among other things, attending parenting classes, seeking counseling, paying child support, or visiting with the child. Expecting a parent to assist in identifying alternative placements that might be willing to take the child is no more a burdensome obligation that those already listed, especially where those possible alternatives are unrelated to the child.
B.A.S. was first mentioned by the mother as a possible alternative to the termination of her parental rights at the termination hearing itself. The evidence would support a conclusion that the mother's last-minute questioning of B.A.S. to determine whether B.A.S. would be willing to serve as an alternate placement for the child, even where B.A.S. responded in the affirmative, was not sufficient to constitute a truly viable alternative to the termination of the mother's parental rights.
This court is "required to apply a presumption of correctness to the trial court's finding that placement of the [child] with [B.A.S.] was not a suitable alternative to termination [of the mother's parental rights]." Ex parte State Dep't of Human Res., 834 So.2d 117, 122 (Ala.2002). Given the facts of this case, we cannot say that the trial court abused its discretion in determining that placing the child with B.A.S. was not a viable alternative to the termination of the mother's parental rights. The mother has not demonstrated that the trial court erred in terminating her parental rights. Therefore, we affirm.
AFFIRMED.
*1198 YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.
CRAWLEY, J., dissents.
MURDOCK, Judge, concurring in the result.
While I generally agree with the majority's analysis as to why B.A.S. should not be considered a "viable alternative" in this case, I write separately to note the following.
The first sentence of § 26-18-7, Ala. Code 1975, states:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
In essence, the majority concludes that the mother is unfit and is incapable of being made fit, i.e., that the standard articulated in the first sentence of § 26-18-7 is met, primarily because of the mother's mental retardation.[4] I agree.[5]
In my view, however, the evidence in this case compels the conclusion not only that the termination of parental rights is warranted because of the mother's mental retardation, but also because she has abandoned her child by failing to exercise such visitation rights as she had been granted. See R.K. v. R.J., 843 So.2d 774 (Ala.Civ. App.2002) (concluding that a father who did not have custody of his child had nonetheless abandoned the child by failing to fulfill his parental role to the extent circumstances allowed). Such abandonment constitutes a separate reason for termination independent of the mother's mental retardation. See § 26-18-7(a)(1) and (c), Ala.Code 1975. Furthermore, it means that no proof was required "of reasonable efforts to prevent removal or reunite the child" with the mother. See § 26-18-7(a)(1).
In addition, I take note of the statement in the majority opinion that "[w]e are not unswayed by the mother's argument that a mentally retarded person is not, for that reason alone, an unfit parent." 865 So.2d at 1195. I take this statement to mean that mentally retarded persons are not always, for that reason alone, unfit parents. So understood, I agree with this statement.
CRAWLEY, Judge, dissenting.
I must respectfully dissent. The mother argues that DHR failed to consider whether there were alternatives other than termination. I see no time limitation in the requirement that DHR prove that there are no viable alternatives to termination, other than the requirement that DHR "present evidence to the court of recent attempts to locate viable alternatives." Wilson v. State Dep't of Human Res., 527 *1199 So.2d 1322, 1324 (Ala.Civ.App.1988). Ms. Sandlin testified that, had DHR known about the sister-in-law, it would possibly have considered her as a relative placement resource. As I have said before, "[t]he mother is receiving SSI checks for her mental limitations and is not in a position to conceive of alternatives." L.A.G. v. State Dep't of Human Res., 681 So.2d 596, 601 (Ala.Civ.App.1996) (Crawley, J., concurring specially). To require DHR to investigate the mother's family, including her in-laws, before terminating her rights to her child forever would seem, in my opinion, to be well within the description of the agency's duties, which are based on the mandate that it attempt to reunite families. I would reverse the trial court's judgment terminating the mother's parental rights and remand the case to the trial court for it to order DHR to consider and investigate B.A.S. as a potential relative resource. Therefore, I must dissent.
NOTES
[1] The unknown biological father of the child was served with notice of the termination proceeding by publication and did not appear at the termination hearing. The trial court terminated the father's parental rights. However, for the purposes of this opinion, we address the facts and the trial court's judgment only as they pertain to the appellant mother.
[2] The mother did not object to that testimony or evidence on hearsay grounds. See Y.M. v. Jefferson County Dep't of Human Res., [Ms. 2010755, Jan. 24, 2003] ___ So.2d ___ (Ala. Civ.App.2003) (holding that the trial court erred in admitting certain hearsay evidence during a termination hearing).
[3] The record does not indicate whether long-distance telephone service was necessary for the mother to contact DHR social workers.
[4] The majority also notes the mother's failure to visit or maintain consistent custody with the child. See § 26-18-7(b)(2) and (3), Ala. Code 1975.
[5] See also State Dep't of Human Res. v. A.K., 851 So.2d 1 (Ala.Civ.App.2002) (Murdock, J., dissenting and citing Ex parte F.P., [Ms. 1002146, Feb. 22, 2002*] (Ala.2002) (Stuart, J., dissenting)). (*Note from the reporter of decisions: On March 21, 2003, on application for rehearing, the Alabama Supreme Court withdrew its February 22, 2002, opinion and substituted a new one. 857 So.2d 125. Justice Stuart dissented and issued a dissenting opinion on March 21, 2003.)