Rel: December 16, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

## CL-2022-0541

_____

## A.R.H.B.

### v.

## Madison County Department of Human Resources

### Appeal from Madison Juvenile Court
### (JU-20-412.02)

THOMPSON, Presiding Judge.

On August 2, 2021, the Madison County Department of Human Resources ("DHR") filed in the Madison Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of A.R.H.B. ("the mother") and D.D.B. ("the father") to the minor child born of their

marriage ("the child"). The juvenile court conducted a hearing on DHR's petition at which it received ore tenus evidence.

On March 30, 2022, the juvenile court entered a judgment in which it made findings of fact and ordered that the parental rights of the mother and of the father be terminated. The mother filed a timely notice of appeal to this court. The father has not appealed, and, therefore, this opinion contains only limited references to the facts as they pertain to him.

The record reveals the following pertinent facts. In addition to the child, the mother has an older child who was 14 years old at the time of the March 16, 2022, termination-of-parental-rights hearing. The mother's older child is in the custody of his father, and the mother rarely visits that child. The mother stated that she had last seen her older child at Christmas in 2021 for approximately one hour and that he had last spent the night in a home in which she resided when he was approximately five years old.

The child was born in February 2018, and he was four years old at the time of the termination-of-parental-rights hearing. Arronie Riley, a DHR investigator, testified that on May 13, 2020, DHR received a report

from an anonymous source that the mother was living in a motel and using drugs in the presence of the child. Riley testified that it took her several days to locate the mother and that, during that search for the mother, she contacted the mother's mother ("the maternal grandmother") and the mother's grandmother ("the maternal great-grandmother") to seek information that would allow her to locate the mother. Riley located the mother at the mother's place of employment several days after she had spoken with the aforementioned maternal relatives. At that time, the mother admitted that she did not have stable housing and that she had recently used marijuana, but the mother denied using methamphetamine, as had been alleged in the anonymous report to DHR. Riley stated that she attempted to create a safety plan for the mother and the child but that the friends with whom the mother sought to leave the child each had a pending drug charge or a drug conviction, and, Riley stated, the mother refused to agree to a safety plan that would place the child with the maternal grandmother or the maternal great-grandmother. The child was placed in foster care on May 19, 2020, and he has remained in foster care since that time. According to Riley, when

the child was placed in foster care, he did not have a pediatrician, he was underweight, and he had not been immunized.

At the initial individualized-service-plan ("ISP") meeting, DHR established several goals for the mother, including that she obtain and maintain stable housing, maintain stable employment, and stop using illegal drugs. Acey Smith, the first social worker assigned to the child's case, testified that DHR offered the mother services, including color-code drug screening, a mental-health assessment, a substance-abuse assessment, parenting classes, and visitation with the child. In addition, Smith stated, DHR asked the mother to comply with any recommendations resulting from the assessments. Smith left DHR three months after the child was placed in foster care, which ended her work on the child's case. Smith stated that, when she left, the mother had undergone a substance-abuse assessment at Aletheia House. The recommendation resulting from the substance-abuse assessment was that the mother attend outpatient substance-abuse treatment.

Roslyn Guyton, the social worker assigned to the child's case in September 2020, testified that the mother had exhibited housing instability throughout the time that the child has been in foster care.

According to Guyton, the mother provided her with the maternal great-grandmother's address to use as her mailing address but moved frequently between motels and sometimes lived with friends as well as the maternal great-grandmother. In her testimony, the mother at first claimed that she had had stable housing for the entire time the child had been in foster care, stating that she had lived with the maternal great-grandmother. However, on cross-examination, the mother stated that she frequently argued with the maternal great-grandmother and that, after those arguments, she would leave the maternal great-grandmother's home and stay in motels. The mother stated that she had lived with the maternal great-grandmother "off and on." The mother estimated that, during the approximately 22 months that the child had been in foster care, she had actually lived in the maternal great-grandmother's home for 6 months.

The mother testified that she is an assistant manager at a local fast-food restaurant and that she had maintained that employment since November 2019; she stated that she earned approximately $26,000 in 2021. The mother admitted that she had not paid child support for the benefit of the child. On questioning from her attorney, the mother

answered in the affirmative to questions regarding whether she had taken toys and clothes for the child to her visits with him. However, the mother did not testify regarding any clothes she might have taken to those visits to give to the child. Instead, the mother stated that she almost always took food to the visits and that she took building-block toys to each visit for the child. The mother explained, however, that she never allowed the child to keep the building-block toys after a visitation because, she said, she was concerned that he would swallow a piece of the toy.

Guyton testified that the mother completed a parenting class through Aletheia House in late October 2020 but that the mother left a substance-abuse-treatment program through Aletheia House without completing that program. The mother testified, however, that she left the substance-abuse-treatment program with only one class remaining to complete. Emily Shulze, the mother's therapist in Aletheia House's intensive outpatient substance-abuse-treatment program, stated that the mother had completed the requirements of that program but that the mother had not completed the final discharge processes necessary to be considered to have completed that program. According to Shulze, the

mother had attended the substance-abuse program from June 17, 2020, through November 4, 2020.

Erin Breeden, a laboratory technician at Alternative Sentencing, a company that oversaw a drug-testing program used by DHR, testified regarding the results of the mother's drug screens taken at DHR's request. The parties' attorneys questioned Breeden extensively regarding a discrepancy between an exhibit ("Exhibit 3") that she had compiled setting forth the mother's drug-screen results and another exhibit ("Exhibit 5") that detailed each of those drug screens by date and identified the particular substances for which the mother had tested either positive or negative.[1] Those exhibits and Breeden's testimony

---

[1]The contents of both Exhibit 3 and Exhibit 5 clearly demonstrate that the mother tested positive on 23 occasions and was a "no show" on 20 occasions. The mother also failed to appear for an additional drug screen immediately before the termination-of-parental-rights hearing, and that drug-screen result was not listed on the exhibits. Breeden was unable to explain the reason why Exhibit 5's computer-generated summary reflecting the number of times the mother tested positive was in direct contrast to the contents of Exhibit 5. The juvenile court overruled a request by the mother's attorney that Exhibit 3 and Exhibit 5 be stricken from the record, noting that the extensive questioning of Breeden had established that the erroneous summary on Exhibit 5 was in direct contradiction to the contents of that exhibit and stating that it would not disregard evidence of the mother's positive drug screens because of that error.

indicated that, since the time the child had been placed in foster care in May 2020, the mother had undergone 33 drug screens and had tested negative 10 times; had tested positive for the use of marijuana 8 times; had tested positive for amphetamines and methamphetamine 13 times; and had tested positive for a combination of amphetamines, methamphetamine, and marijuana 2 times. In addition, the mother had failed to appear for 21 drug screens.

Shulze explained that, because of the restrictions imposed by the COVID-19 pandemic, all of the mother's substance-abuse treatment had been conducted via video-conferencing technology. In addition, she stated that the substance-abuse-treatment program had often been unable to conduct drug testing on the mother and that she had expected DHR, or its service provider, to notify her of any drug screen in which the mother tested positive. Exhibit 3 and Exhibit 5 demonstrate that while the mother attended the substance-abuse-treatment program at Aletheia House the mother had continued to test positive on her DHR-requested drug screens. For example, on June 24, 2020, the mother tested positive for marijuana, methamphetamine, and amphetamine. On July 8, 2020, September 29, 2020, and October 13, 2020, the mother tested positive for

marijuana on drug screens requested by DHR. According to Shulze, on August 8, 2020, the mother had been tested for drug use through Aletheia House and the results of that drug screen were positive for the use of marijuana. Shulze stated that the mother had attributed that positive drug screen result to her use of marijuana in June 2020, before she entered the substance-abuse-treatment program.

Shulze stated that the Aletheia House substance-abuse-treatment program had not received notification of the mother's positive drug screens from DHR. In response to questioning by the juvenile court, Shulze stated that if Aletheia House personnel had been aware that the mother was continuing to abuse drugs while she was attending the Aletheia House substance-abuse-treatment program, the mother would have been offered a more intensive level of treatment; if the mother had refused that offer, Shulze said, the mother would have been dismissed from the substance-abuse-treatment program.

Guyton testified that, after the mother left the Aletheia House substance-abuse-treatment program in November 2020, the mother had asked Guyton, in early 2021, for authorization to again seek substance-abuse treatment. Guyton stated that she explained to the mother that

any patient dismissed from the Aletheia House substance-abuse-treatment program could reapply for admission to that program after 30 days from the date that the patient had left the program. Shulze stated that the mother had contacted her again about seeking treatment at Aletheia House. However, according to Shulze, although the mother scheduled an assessment for readmission to the Aletheia House program, the mother had not attended that assessment and did not reenter the program. At the time of the termination-of-parental-rights hearing, the mother had not again sought substance-abuse treatment.

Between November 2020, when she left the Aletheia House substance-abuse-treatment program, and May 2021, the mother tested positive intermittently for amphetamines and methamphetamine, and she failed to appear for several drug screens; the other drug screens during that time had negative results. However, from May 2021 through March 16, 2022, when the termination-of-parental-rights hearing was conducted, the mother consistently tested positive for the use of amphetamines and methamphetamine. The mother also failed to appear for some drug screens between May 2021 and March 16, 2022. At the

10

time of the March 16, 2022, termination-of-parental-rights hearing, the mother had not had a negative drug-screen result since April 2021.

At the termination-of-parental-rights hearing, the mother testified that she was a "functioning addict." The mother stated that she smokes methamphetamine several times a day, every day, to help her focus so that she can work and take care of other aspects of her life. The mother pointed out that she had maintained her employment in spite of her use of illegal drugs, and, she stated, she believed that she could properly care for the child. According to the mother, however, she would immediately stop using all illegal drugs if the child were returned to her custody. The mother explained that she "returned" to using illegal drugs because the child had been removed from her custody, and, she said, she would not need illegal drugs if custody of the child were returned to her.

The mother completed a mental-health evaluation in late summer 2021. The parties did not present evidence regarding the substance of that evaluation, but Guyton testified that the mental-health evaluator did not recommend any services for the mother as a result of that evaluation. The mother testified that she had had a mental-health crisis in 2010, when she was 22 years old, and that, at that time, she had been

11

hospitalized because she was suicidal. According to the mother, during that hospitalization, she was diagnosed as having bipolar disorder, attention-deficit/hyperactivity disorder, anxiety, and depression. The mother stated that she had not sought mental-health treatment since that time. She claimed that, beginning in 2013, she began to use illegal drugs to "self medicate." We note, however, that the mother also began dating the child's father in 2013, and she admitted that the couple used drugs together.

With regard to possible relative resources for the child, Riley testified that the child's paternal grandmother and the child's paternal great-grandmother each had "indicated" reports with DHR. See Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-34-.07(1). In addition, the paternal great-grandmother, who lives with the paternal grandmother, tested positive for the use of methamphetamine and amphetamines. For that reason, Riley explained, both of those relatives were rejected as safety-plan placements for the child. DHR's attorney asked Guyton whether any members of the parents' families had contacted DHR regarding serving as a relative placement for the child. Guyton testified that the child's maternal family had not attempted to contact her

12

regarding the child but that she had "had contact" with the paternal grandmother. According to Guyton, she had asked the paternal grandmother to complete and return to DHR a package requesting information to determine if she would qualify as a relative resource, but, she said, the paternal grandmother had not returned the completed package to DHR. In addition, Guyton stated, the paternal grandmother lives in the same home as the paternal great-grandmother, who tested positive for the use of methamphetamine and amphetamines; Guyton stated that, because of the paternal grandmother's failure to complete and return the necessary paperwork and because she lived in a home with a family member who was using illegal drugs, DHR rejected the paternal grandmother as a relative resource for the child.

Guyton testified that the child was doing well in his foster home and that the child's foster mother wanted to adopt him if the juvenile court terminated the mother's and the father's parental rights. According to Guyton, at a July 21, 2021, ISP meeting, the permanency plan for the child was changed to "adoption by current foster parent."

In its March 30, 2022, judgment terminating the parents' parental rights, the juvenile court found, among other things, that the mother had

13

failed to adjust her circumstances to meet the needs of the child, that her conduct or condition that rendered her unable to properly parent the child was not likely to change in the foreseeable future, and that there were no viable alternatives to the termination of the mother's parental rights.

The grounds warranting a termination of parental rights are set forth in § 12-15-319, Ala. Code 1975, of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala. Code 1975. With regard to the consideration of a petition seeking to terminate parental rights, this court has explained:

> "A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights."

B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004) (citing Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990)).

> "On appeal from ore tenus proceedings, this court presumes the correctness of the juvenile court's factual findings. See J.C. v. State Dep't of Human Res., 986 So. 2d 1172 (Ala. Civ. App. 2007). This court is bound by those findings if the record contains substantial evidence from which the juvenile court reasonably could have been clearly convinced of the fact sought to be proved. See Ex parte McInish, 47 So. 3d 767 (Ala. 2008) (explaining standard of review of factual determinations required to be based on clear and convincing evidence)."

14

C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015).

The mother raises several evidentiary issues on appeal. We find her argument that the juvenile court erred in determining that DHR had presented sufficient evidence that it had made a recent and sufficient search for relative resources, i.e., for viable alternatives to termination, to be dispositive of this appeal.

It is not sufficient that, in support of a petition to terminate parental rights, DHR presents evidence indicating that a child is dependent and that there exists at least one ground under § 12-15-319 that would warrant a termination of parental rights. See, e.g., D.J. v. Etowah Cnty. Dep't of Hum. Res., [Ms. 2200394, Oct. 8, 2021] ___ So. 3d ___, ___ (Ala. Civ. App. 2021) (explaining that a finding of dependency, alone, is not sufficient to terminate parental rights and that a juvenile court must also determine that there are no viable alternatives to the termination of parental rights). Instead, in addition to the foregoing, DHR must also present evidence indicating that there are no viable alternatives to the termination of a parent's parental rights. B.M. v. State, supra; Ex parte Beasley, supra.

15

With regard to the possibility of placing a child with a relative as an alternative to the termination of a parent's parental rights, this court has held that "'"DHR must present 'evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least dramatic alternative.'"'" J.F.S. v. Mobile Cnty. Dep't of Hum. Res., 38 So. 3d 75, 78 (Ala. Civ. App. 2009) (quoting C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 987 (Ala. Civ. App. 2008), quoting in turn V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998), quoting in turn Bowman v. State Dep't of Hum. Res., 534 So. 2d 304, 306 (Ala. Civ. App. 1988)) (emphasis omitted). See also V.M. v. State Dep't of Hum. Res., 710 So. 2d 915 (Ala. Civ. App. 1998) (same). DHR, and not a possible relative custodian, has the burden of initiating an investigation into the suitability of a possible relative placement for a child. D.S.S. v. Clay Cnty. Dep't of Hum. Res., 755 So. 2d 584, 591 (Ala. Civ. App. 1999).

In this case, DHR's attorney asked Guyton only if certain relatives had contacted DHR, and she responded that three had not and that DHR had rejected a fourth relative, the paternal grandmother, as being an unsuitable placement. That brief testimony constituted the entirety of

16

the evidence presented by DHR regarding possible relative resources for the child. Although DHR presented evidence indicating that the mother had not been willing to place the child with the maternal grandmother or the maternal great-grandmother as an initial safety-plan placement for the child, DHR presented no evidence concerning the mother's reason for that refusal, and it presented no evidence regarding any further contacts that DHR social workers might have had with those maternal relatives. DHR failed to present any evidence concerning its social workers' efforts to locate and investigate possible relative placements for the child. We have recognized that, "'[a]lthough DHR has a responsibility to investigate alternate relative placements for a child, that obligation does not entirely alleviate the responsibility of the parent who purports to oppose the termination of his or her parental rights of making DHR social workers aware of alternative placement possibilities.'" J.F.S. v. Mobile Cnty. Dep't of Hum. Res., 38 So. 3d at 78 (quoting B.S. v. Cullman Cnty. Dep't of Hum. Res., 865 So. 2d 1188, 1197 (Ala. Civ. App. 2003)). In this case, however, DHR failed to present any evidence regarding whether DHR social workers had asked the mother and the father to provide a list of names of possible relatives with whom the child might be placed, and

17

it presented no evidence indicating that DHR had investigated any relatives that the mother or the father might have identified. Similarly, the record contains no indication whether DHR social workers sought to, or were able to, identify other relative placements for the child.

Recently, our legislature amended § 12-15-319, which sets forth grounds a juvenile court may consider when determining whether to grant a petition seeking to terminate parental rights. That amendment specifies:

> "(c) The juvenile court is not required to consider a relative to be a candidate for legal guardian of the child in a proceeding for termination of parental rights if both of the following circumstances exist:
>
>> "(1) The relative did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative.
>>
>> "(2) The goal of the current permanency plan formulated by the Department of Human Resources is adoption by the current foster parents.

§ 12-15-319(c) (emphasis added).

DHR asserts in its brief submitted to this court that DHR social workers contacted the maternal grandmother and the maternal great-

18

grandmother during its attempt to locate the mother in May 2020 in order to investigate the report that resulted in the child's being placed in foster care. Therefore, DHR contends, the maternal grandmother and the maternal great-grandmother were "aware of DHR's involvement" and, under § 12-15-319(c), are now precluded from being considered as possible placements for the child. However, the evidence demonstrates that Riley located the mother three or four days after speaking with the maternal grandmother and the maternal great-grandmother; DHR did not present any specific evidence regarding if and when the maternal grandmother and the maternal great-grandmother became aware that the child was in foster care. The mother testified that, during the time the child had been in foster care, she lived briefly with the maternal great-grandmother; thus, it can be inferred that the maternal great-grandmother was aware that the child was not living with the mother. However, DHR failed to question the DHR social workers during the termination-of-parental-rights hearing regarding any other contact those social workers might have had with the maternal grandmother and the maternal great-grandmother. DHR did not present any evidence indicating that it had had any further contact with the maternal

19

grandmother or the maternal great-grandmother, that those relatives had been aware that the child was in foster care, or that DHR had inquired whether either the maternal grandmother or the maternal great-grandmother was willing to serve as a relative resource for the child. Moreover, DHR did not present any evidence regarding whether there were other possible relative resources -- other than the maternal grandmother, the maternal great-grandmother, the paternal grandmother, and the paternal great-grandmother -- for the child.

Nothing in § 12-15-319(c) alters or alleviates DHR's burden of locating and investigating possible relative resources for a child. Instead, that subsection limits, in certain circumstances, the juvenile court's consideration of certain relatives as possible placements for a child when those relatives have not come forward after being notified by DHR of a child's being in DHR's custody and, presumably, asked whether they could accept a child into their homes. In this case, DHR did not present evidence regarding any relatives that might have been contacted by DHR social workers concerning their willingness to serve as a placement for the child. The record contains no evidence regarding whether, or when,

any relatives of the parents became aware of the child's having been placed in foster care such that § 12-15-319(c) might be implicated.

We recognize that it is probable that the DHR social workers properly located and investigated relative resources in this matter. This court's holding in this matter is based on the failure to present evidence concerning those efforts. "'[T]he party petitioning for termination of parental rights bears the burden of proving the lack of a viable alternative by clear and convincing evidence.'" D.J., ___ So. 3d at ___ (quoting K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 912 (Ala. Civ. App. 2017)). In this case, DHR failed to meet its evidentiary burden. This court is unable to determine from the record whether the DHR social workers properly investigated viable alternatives to the termination of the mother's parental rights because DHR failed to present sufficient evidence on that issue. Accordingly, we reverse the judgment terminating the mother's parental rights.

REVERSED AND REMANDED.

Edwards, Hanson, and Fridy, JJ., concur.

Moore, J., concurs in the result, without opinion.