Rel: December 13, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0569

_____

## J.H.

### v.

## Jefferson County Department of Human Resources

## Appeal from Jefferson Juvenile Court
## (JU-20-1429.02)

LEWIS, Judge.

J.H. ("the father") appeals from a judgment entered by the Jefferson Juvenile Court ("the juvenile court") terminating his parental rights to P.P.H. ("the child"), who was born in December 2020. We affirm the juvenile court's judgment.

Procedural History

On October 17, 2023, the Jefferson County Department of Human Resources ("DHR") filed in the juvenile court a petition to terminate the parental rights of the father and of R.P. ("the mother") to the child. On January 25, 2024, the father filed a motion requesting that custody of the child be transferred to the child's paternal grandmother C.W. ("the paternal grandmother"). The paternal grandmother filed a motion to intervene in the termination-of-parental-rights action on March 5, 2024. The child's foster parents, An.M. and Ad.M., filed a motion to intervene on March 20, 2024. Those motions were granted on April 1, 2024. On April 24, 2024, the juvenile court entered an order awarding the paternal grandmother "unsupervised daytime visitation, with the minor child, for three (3) hours, one day, every other week."

After a trial, the juvenile court entered a judgment on May 29, 2024, terminating the parental rights of the father and of the mother to the child. The juvenile court made the following findings, which are pertinent to the issues raised on appeal:

> "…[M]uch of the trial revolves around whether DHR has exercised reasonable efforts as it relates to exploring paternal relatives as possible placements for custody of the child and whether this Court can conclude that there are no viable

2

alternatives to the termination of the parents['] parental rights. More specifically, DHR's first attempt, after three years that this child had been in foster care, to perform an Accurint search and to send out letters to the paternal side of the family was made for the first and only time in January 2024. Also, called into question was the fact that the letters that were sent out in January of 2024 were back dated January 2023 and whether this was a mistake or an attempt to make it appear as if DHR had made this attempt earlier. In defense of DHR, the parents also have the responsibility of making DHR aware of these alternate relative placements. The only relative that the father provided DHR with was the [child's] paternal aunt [Jan. H. ("the paternal aunt"),]…, o[n] March 2022[,] and for whatever reason, that placement did not work out. That the father then waited until August 2023 to provide the name of his mother, [the paternal grandmother.] DHR has investigated these names as requested by the father once those names were presented.

"There is no dispute that DHR worked with [the] paternal aunt … around approximately June 2022 until approximately June 2023. DHR worker stated that DHR did not look into any other paternal relatives while they were working with the [paternal] aunt. DHR did testify that although they were working with the paternal aunt … for many months, phone calls were made to both the paternal grandmother and paternal grandfather, with the social worker and [the paternal aunt] on [a] conference call with them and that the paternal grandparents were aware of the child being in foster care, they were aware that [the paternal aunt] was attempting to gain custody of the child and that at that time, the [paternal] grandmother could not obtain custody of the child because she was taking care of her very ill husband and that the [paternal] grandfather stated that he would support and assist [the paternal aunt] if she got custody. The telephone calls were made sometime between June 2022 and June 2023. Furthermore, when DHR was investigating [the paternal aunt] as a possible relative

3

placement, [the paternal aunt] listed the paternal grandmother and paternal grandfather as her family support/backup if she needed help raising the child. [The paternal aunt] does not deny this but says she hardly talks to her parents, even though she listed them as her support, and that because they don't talk a lot, they probably did not know she had listed them as her support. That though there were at least two attempts and possibly a third attempt to place the child with [the paternal aunt], it did not work out and the child remained in foster care. The point of all of this reference is that this is where this Court can positively connect the paternal grandparents['] knowledge of the child being in foster care as the social worker, the [paternal] aunt and the paternal grandmother all remember talking to each other (again, the [paternal] grandfather was not present at court to testify) about supporting their daughter if she got custody proving that [the] paternal grandmother … and the paternal grandfather … had knowledge that the child was not in the care of the parents, that their daughter, [the paternal aunt], was attempting to get custody, that they were willing to assist their daughter if she got custody but did not make any request for custody at that time and they were aware of DHR's involvement with their grandchild.

"It also appears that neither grandparent ever attempted to visit with this child until somewhere around August of 2023 when there was a motion made by father's attorney for a home evaluation and request for visitation for the paternal grandmother and in December 2023 that actual visitation started. Furthermore, it was not until March 5, 2024[,] that the grandparents filed their Motion/Petitions for Intervention in this case. Also, though the Court understands that the [paternal] grandfather … lives in another state, it speaks volumes that he was not present for this termination trial, though he has been allowed to intervene as a party.

"A lot of blame has been put on DHR for things it should have done and did not do throughout this case and rightfully

4

so, however, there has to be much blame put on these parents for their deficiencies as this child has been in foster care for three and a half years with little to no change in their circumstances and withholding the names of any relatives until the midnight hour. There must also be blame put on these grandparents, even though officially, they may not have received a letter from DHR until January or February 2024, the [paternal] grandparents have known this child was not in custody of the parents, they have known that their daughter, [the paternal aunt], was attempting to get custody of the child, that it was not until August 2023 that paternal grandmother … began to show interest in the child by requesting through her son[']s attorney a home evaluation and visitation and it was not until March 5, 2024[,] that the paternal grandparents filed for intervention in this case.

"Furthermore, a lot of fuss was made about DHR waiting until January 2024 to send out letters to the paternal side of the family. This is frustrating to this Court as well[,] but it also evidences DHR's requirement to provide recent attempts to locate all viable alternatives in order to establish that termination of parental rights is the least dramatic alternative. This attempt revealed no new relatives or persons interested in obtaining custody other than relatives we already knew about, the paternal grandmother and paternal grandfather.

"Code of Alabama[,] Section 12-15-319 is clear as to the grounds for termination of parental rights when it comes to the parents and unfortunately, without going into the many details in this order, the Court would note that the parents clearly meet [§§] 12-15-319(A)(7), (9), (10), (11), (12), (13)(a),(b) and (c)[, Ala. Code 1975]. Furthermore, that same Code of Alabama, Section 12-15-319(c)(1) and (2) is very clear that these grandparents (1) did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative, and

5

(2) that the goal of the current permanency plan formulated by DHR is adoption by the current foster parents. Though there may be an argument as to the timing of the letters that were sent out by DHR and DHR's reasonable efforts as it applies to investigating relatives for placement, it is evident that the [paternal] grandparents have known for a long time that the child was not in the parents['] custody and that DHR was involved with this child and for whatever reason they did not come forward nor w[ere] the[ir] name[s] provided by the father until only recently. Furthermore, after three and a half years, or approximately two years and nine months after paternity was established, it is very hard for this Court to believe that these grandparents 'did not know' that their grandchild was not in the custody of the parents or wonder why they had not seen him for three and a half years that he has been alive, and that they have only now come forward to request custody since termination of parental rights petitions have been filed.

"This Court would also note that the parents have the responsibility in providing DHR with the names of relatives that may be interested in obtaining custody early in cases such as this in order for the child not to languish in foster care for three and a half years. That DHR did investigate each of the two paternal relatives as they were presented by the father, the first being the paternal aunt … beginning in June 2022 and continued to work with her until approximately June 2023 at such time as the [paternal] aunt decided not to go forward with her request for custody. That it was not until August 2023 that [the] father supplied the name of [the paternal grandmother] … as another relative resource and DHR began home evaluations investigations, and eventually setting up visitation with her. That at no time does this Court recall where the father has ever presented the paternal grandfather's name to DHR but even so, it was not until March 5, 2024[,] that both the paternal grandmother and paternal grandfather filed a Motion for Intervention and Petition for Intervention in this case requesting custody.

6

"…[E]ven though; 1) DHR had changed its case plan to termination of parental rights with adoption by current foster parents; and 2) even though DHR had filed the Termination of Parental Rights Petition on October 17, 2023; and 3) even though the Court is very much aware that these grandparents have known [their] grandchild was in foster care or was not in the custody of the child's parents much more than four months before filing any pleading to get custody; and 4) even though DHR sent out letters to the relatives in January 2024 that may have been dated January 2023; and 5) even though it took the grandparents until March 7, 2023[,] to file a Motion to Intervene to request custody; and 6) even though Code of Alabama, [§§] 12-15-319(c)(1) and (2) applies, this Court granted the interventions and gave the paternal grandparents an opportunity to be heard so that the Court would be certain that in fact, all viable alternatives to termination had be[en] considered.

"The Court once again states that the [paternal] grandfather did not appear for his opportunity to be heard[,] and he appears to be the one person who was the most upset about the date of the letters that DHR sent out in January 2024.

"The [paternal] grandmother did appear and in consideration of her testimony the Court appreciates her willingness but also has to consider the following: her lacking of a relationship with the child other than some visits in the last six months; the fact that even when given the chance on at least four occasions to be interviewed by the bonding expert, the [paternal] grandmother refused to participate; the fact that …[neither] she nor the [paternal] grandfather filed anything to get custody of this child for far more than four months once they learned of the child not being in the custody of the parents; the fact that at the time the paternal grandparents did file for intervention, DHR's case plan was 'termination of parental rights, adoption by current foster

7

parents' and had been since at least October 17, 2023[,] when the termination petitions were filed; that after given the opportunity to listen to the grandmother and considering the timing of her request, the Court feels that the filing of these motions to intervene were not as much about the best interest of the child but more about the best interest of her son, the father of the child, who has had three and [one] half years to do what he had to do to get custody and for whatever reason, has not done so and this appears to be a last chance 'Hail Mary' attempt to stop the termination of parental rights from happening; and finally, the Court considers the attachment that this child has developed to his foster parents, the persons that have been there for him every single day for at least the last three years. Unfortunately, the Court feels that the paternal grandmother … and the paternal grandfather … are not viable alternatives to termination of parental rights and their requests for custody are hereby denied.

    "….

    "…[T]he Court is not required to consider a relative to be a candidate for legal guardian of the child in a proceeding for termination of parental rights if the relatives did not attempt to care or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative and the goal of the current permanency plan formulated by DHR is adoption by the current foster parents[.]

    "…[DHR] has investigated all viable alternatives to termination of parental rights and the Court finds that there exists no other viable alternatives consistent with the best interests of the child, other than termination of parental rights[.]"

(Emphasis in original.)

8

The father timely filed his notice of appeal with this court on June 11, 2024. The mother did not appeal.

## Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."
>
> "'KGS Steel, Inc. [v. McInish], 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].
>
> "'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through a prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also

9

look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., [Ms. CL-2023-0809, Mar. 15, 2024] ___ So. 3d ____, ____ (Ala. Civ. App. 2024).

### Discussion

On appeal, the father argues: (1) that DHR failed to use reasonable efforts to explore paternal relatives of the child for potential placement and (2) that placement of the child with the paternal grandmother was a viable alternative to termination of his parental rights.[1]

---

[1]Although the father mentions the paternal grandfather, his argument focuses solely on placement with the paternal grandmother. The paternal grandmother and the paternal grandfather were not married to each other.

10

With respect to the father's argument that DHR failed to use reasonable efforts to explore paternal relatives of the child for potential placement, this court has explained:

"We have often stated that, in addition to establishing the dependency of a child and that grounds for the termination of parental rights exist, 'DHR must also present evidence indicating that there are no viable alternatives to the termination of a parent's parental rights.' A.R.H.B. v. Madison Cnty. Dep't of Hum. Res., 378 So. 3d 543, 549 (Ala. Civ. App. 2022). We have also reiterated that '"DHR must present 'evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least [drastic] alternative.'"' C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 987 (Ala. Civ. App. 2008) (quoting V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998), quoting in turn Bowman v. State Dep't of Hum. Res., 534 So. 2d 304, 306 (Ala. Civ. App. 1988)) (emphasis omitted). Because DHR was petitioning for the termination of the father's parental rights …, DHR bore '"'the burden of proving the lack of a viable alternative by clear and convincing evidence.'"' A.R.H.B., 378 So. 3d at 551 (quoting D.J. v. Etowah Cnty. Dep't [of] Hum. Res., 351 So. 3d 1067, 1074 (Ala. Civ. App. 2021), quoting in turn K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 912 (Ala. Civ. App. 2017))."

G.P. v. Dale Cnty. Dep't of Hum. Res., [Ms. CL-2023-0676, June 14, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). "DHR, and not a possible relative custodian, has the burden of initiating an investigation into the suitability of a possible relative placement for a child." A.R.H.B. v. Madison Cnty. Dep't of Hum. Res., 378 So. 3d 543, 549 (Ala. Civ. App.

2022). "'Although DHR has a responsibility to investigate alternate relative placements for a child, that obligation does not entirely alleviate the responsibility of the parent who purports to oppose the termination of his or her parental rights of making DHR social workers aware of alternative placement possibilities.'" J.F.S. v. Mobile Cnty. Dep't of Hum. Res., 38 So. 3d at 78 (quoting B.S. v. Cullman Cnty. Dep't of Hum. Res., 865 So. 2d 1188, 1197 (Ala. Civ. App. 2003)).

In this case, the juvenile court found as follows: DHR failed "to perform an Accurint search and to send out letters to the paternal side of the family" until January 2024, approximately three years after the child was placed into foster care. However, those efforts "revealed no new relatives or persons interested in obtaining custody other than relatives [that were already known], the paternal grandmother and paternal grandfather." The juvenile court noted that "DHR worked with [the paternal aunt] [from] around approximately June 2022 until approximately June 2023." The juvenile court found that the paternal grandparents were willing to support the paternal aunt in obtaining custody of the child; however, the paternal grandmother was unable to "obtain custody of the child because she was taking care of her very ill

12

husband." The juvenile court noted that "it was not until August 2023 that paternal grandmother … began to show interest in the child by requesting through her son[']s attorney a home evaluation and visitation and it was not until March 5, 2024[,] that the paternal grandparents filed for intervention in this case." According to the juvenile court's judgment, DHR conducted a home evaluation on the paternal grandmother's home and set up visitation for her and the child.

The father's argument focuses on DHR's failure to timely notify the paternal grandparents that the child was in foster care and to attempt to locate other paternal relatives in a timely manner. However, the father does not challenge the juvenile court's findings (1) that DHR made repeated efforts to explore the paternal aunt as a relative resource; (2) that the paternal grandparents were aware (despite any failure on DHR's part to notify them) that the child was in foster care;[2] (3) that the paternal grandparents delayed in attempting to obtain custody of the child despite their knowledge that the child was in foster care; (4) that,

---

[2]The paternal grandmother testified that she found out that the child was in foster care shortly after her husband died in January 2022. The paternal grandfather testified that he knew in 2021 that the child was in foster care.

13

once the paternal grandmother sought custody of the child, DHR made efforts to investigate her; and (5) that the Accurint search, albeit untimely conducted, revealed no other relative resources. Moreover, we have reviewed the transcript and have determined that those findings are supported by the evidence.

Considering those findings, we cannot conclude that the juvenile court erred in finding that there was clear and convincing evidence that DHR made reasonable efforts to locate viable relative placements.

Turning to the father's second argument, that placement of the child with the paternal grandmother was a viable alternative, we note that the juvenile court found that

> "[the paternal] grandparents (1) did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative, and (2) … the goal of the current permanency plan formulated by DHR is adoption by the current foster parents."

(Emphasis omitted.) The father does not challenge those findings on appeal. Moreover, we note that those findings are supported by the evidence in the record.

Section 12-15-319(c), Ala. Code 1975, provides:

14

"The juvenile court is not required to consider a relative to be a candidate for legal guardian of the child in a proceeding for termination of parental rights if both of the following circumstances exist:

"(1) The relative did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative.

"(2) The goal of the current permanency plan formulated by the Department of Human Resources is adoption by the current foster parents."

In Z.P. v. Mobile County Department of Human Resources, [Ms. CL-2024-0177, Sept. 27, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024), this court explained that "[s]ection 12-15-319(c)[, Ala. Code 1975,] vests a juvenile court with the discretion to disregard a relative as a potential custodian of the child under the enumerated circumstances." When "§ 12-15-319(c) is implicated … the juvenile court ha[s] the discretion to refuse to consider the … relatives [at issue] as potential custodians for the child and the placement of the child with a paternal relative as a viable alternative to the termination of the father's parental rights." ___ So. 3d at ___.

Because the juvenile court found that § 12-15-319(c) was applicable and the father did not challenge that finding on appeal, we cannot conclude that the juvenile court exceeded its discretion in determining that placement of the child with either of the paternal grandparents was not a viable alternative to the termination of the father's parental rights. See Z.P., ___ So. 3d at ___.

## Conclusion

Based on the foregoing, we affirm the juvenile court's judgment.

AFFIRMED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.